

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TRADING TECHNOLOGIES      )
INTERNATIONAL, INC.,        )
                             )
           Plaintiff,     )
                             )
     vs.                 )     No. 04 C 5312
                             )
eSPEED, INC.,              )
                             )
          Defendant.    )

## MEMORANDUM OPINION AND ORDER

Plaintiff has two patents, U.S. Patent Nos. 6,766,304 (the '304 patent), and 6,772,132 (the '132 patent). Both relate to a software program for use in electronic trading in futures. The software program combines a static ladder price column with moving bid and asked market data, together with a single-action order entry. Defendant came into the market with its own software program. It does not argue that its first program is non-infringing. Rather, it changed its program and contends that the new program does not infringe. It also contends that the patents are invalid because the "invention" is obvious, and because of prior public use more than a year before the patent applications, and that there is no evidence of irreparable harm. Plaintiff seeks a preliminary injunction. That motion is, for now, denied.

A preliminary injunction should be granted upon a showing of a reasonable likelihood of success on the merits, irreparable harm if the injunction is not granted, a balance of hardships tipping in favor of the plaintiff, and a tolerable effect on the public interest. We turn first to likelihood of success on the merits.

Defendant contends that there is a substantial question of invalidity. We disagree. The

patent is presumed to be valid, absent a showing of a substantial question. The patents were reviewed twice by the U.S. Patent and Trademark Office (PTO), once through the usual procedures and then again through a special quality review procedure.

Defendant does not raise a substantial question of invalidity based on obviousness. Defendant and its expert point to a number of electronic trading systems used globally by exchanges, ranging from the London International Financial Futures Exchange (LIFFE), the Tokyo Stock Exchange (TSE), the Tokyo International Financial Futures Exchange (TIFFE), and the International Futures Exchange (Intex) of Bermuda. Defendant also argues that two patents, U.S. Patent Nos. 5,297,031 (the '031 patent), and 6,408,282 (the '282 patent), disclose the elements in plaintiff's patents. According to defendant, the trading systems and the two patents used a ladder view (the vertical display of adjacent bid, ask, and price columns) and single click trading capability. Significantly, neither patent nor any trading system combines both features. We note again, with emphasis, that plaintiff's patents survived a rigorous double examination by the PTO, which considered many of the trading systems above, including the '282 patent, and it also evaluated plaintiff's X_Trader device, another trading system that defendant includes in its obviousness argument. Plaintiff also observes that defendant compares the prior art with plaintiff's patents, not on the level of claims but, instead, on the visual appearance of the respective systems. By doing so defendant essentially ignores the important details of plaintiff's patents. Despite defendant's ongoing global search for prior art that discloses the elements in plaintiff's patents, it has not defeated the presumption of validity to which plaintiff is entitled. This is especially true due to the uncertain tone defendant's arguments occasionally take, as communicated in the following heading from one of its briefs: "A Static Price Axis With a Moving Inside Market May Have Been Used In Prior

Art Systems." Thus, no prior art discloses both a static price column and single-action order entry feature, and there was no clear motivation to combine those elements in a single product. This may well be because the program was a different way of doing business which, plaintiff persuasively argues, met with some initial resistance from traders because it was unlike the procedures with which they were familiar. The validity of the patent does not have the imprimatur of a litigated decision.

The obvious copying by defendant, as well as others, provides further support. And the undisputed great commercial success of the program is a secondary consideration of considerable force.

Defendant attacks these conclusions for a number of reasons. It points out that until rather recently futures trading was primarily by open outcry in the pits, a practice that has dramatically given way to electronic trading. There was, thus, no pervasive commercial demand for the type of invention at issue until the explosion of electronic trading in the late 1990s. Previously, the exchanges and brokers preferred an inside market centric perspective because their trading was at the market. Only when the futures traders left the pits and had a need for greater speed and accuracy did the need to combine a static price axis and single-action order entry become obvious. Further, a showing of copying is only equivocal evidence of non-obviousness in the absence of more compelling objective indicia of other secondary considerations. Ecolochem, Inc. v. Southern California Edison Co., 227 F.3d 1361, 1380 (Fed. Cir. 2000).

And it questions the reasons for plaintiff's commercial success.  But do these reasons raise a substantial question regarding the vulnerability of the patent to an invalidity defense?  We think not.

We agree that the need of futures traders for increased speed and accuracy in electronic futures trading is of relatively recent origin.  But that does not necessarily mean that a combination of two concepts known in the prior art to accomplish that purpose is obvious. Changing needs and technological innovation may well lead, in time, to the introduction of new and better devices, procedures and programs, and the patent system rewards the innovator unless the invention was obvious to those skilled in the art.  The PTO did not believe that combination to be obvious.  The copying was, apparently, widespread, and futures traders, after an initial hesitation, have embraced the new program format enthusiastically.  Indeed, defendant points to that commercial success as a reason why plaintiff would not be irreparably harmed if a preliminary injunction is denied.  We are persuaded that defendant has not raised a substantial question respecting validity.

Defendant's contention that the invention was in public use for more than a year prior to the filing of the patent applications is equally unpersuasive.  It argues that a named inventor, Harris Brumfield, commercially exploited the invention more than a year prior to the critical date of March 2, 1999.  It bases that argument on some undisputed facts, a story in an August 28, 2000, trade periodical , snippets of deposition testimony, and some video clips.

The undisputed facts are that Brumfield entered into a consulting agreement with plaintiff on September 29, 1998, for the development of the software program, that a computer with software related to that program was installed in Brumfield's office in January 1999, and

a faster computer, with related software, was substituted for the first computer in February 1999. Thus, if the program was sufficiently perfected before March 2, 1999, to permit its commercial exploitation, it is conceivable that it could have been so used. The evidence that it was so used just is not there.

In the story Brumfield is quoted as saying, "I basically kept it to myself a little over a year .... I didn't mind giving the screen up because I made a killing on it for over a year." Defendant infers the "little over a year" refers to the period before the application, although the more reasonable interpretation is that he was referring to the period prior to the interview, presumably a few days prior to the publication of the story on August 28, 2000. This interpretation is supported by Brumfield's trading records – he did indeed make a killing in July and August 1999.

The depositions of the three named inventors, programmer consultant Simon Tam, and Farley Owens, who worked with Tam, have all been taken. They all disclose a consistent version of events. A version of the software was installed in a computer in Brumfield's office in January 1999, although not the computer he used for trading. But the software was a mess – it kept crashing and displaying inaccurate market data – until it finally was made usable in the late spring or summer of 1999.

Simon Tam and Farley Owens worked on the program primarily at plaintiff's offices in Evanston. Owens lived in the building housing Brumfield's office in Chicago, and he from time to time worked on the program at Brumfield's office before and after Brumfield was engaged in trading. Tam did test-trading as part of the development, placing orders beyond the market and then cancelling them. One time he placed a one-contract order, forgot to cancel it, and the order was thereafter executed at a loss. A remote hookup permitted them to "talk"

to the development computer in Brumfield's office.

Tam and others recall that he was employed at TradeLink after March 4, 1999, but he returned to plaintiff for several days thereafter in order to get the software functioning and, indeed, continued to work on the program before and after his work at TradeLink for a period extending into the summer of 1999. Jay Twery, who is familiar with Tam's employment at TradeLink, has submitted two affidavits. In the first, he states that Tam went to work there on February 16, 1999, took some time off to work on plaintiff's software, and returned to TradeLink for good on February 22, 1999. He based that affidavit on TradeLink's records – the events he described happened six years ago. In the second affidavit he notes that Tam received some pay for the period February 16-28, 1999, that he returned to plaintiff for some period, and that he cannot recall when Tam returned to TradeLink for good. While it is clear that there was a period when Tam was dividing his time between TradeLink and plaintiff, we are persuaded that the chronology stated by Tam is reasonably accurate.

In the aftermath of the hearing, plaintiff has come up with two more affidavits. One is from Andrew Moak Griffen, who managed Brumfield's office. Defendant complains that Griffen was not identified as a witness with knowledge of the purported invention, and, accordingly, to the limited extent that his representations relate to Brumfield's lack of use of the software, we disregard it. But he does tell us that Brumfield was using his prior software, X_Trader, past the critical date, and, indeed, he continued to license that software through April 1999.

Both that affidavit and another executed by Owens provide some information about the video clips. Brumfield had a 50-inch plasma computer monitor. He recorded what was displayed on that monitor. What was displayed on that monitor could have come from his

trading computer, the developmental computer in his office, or the computer in Evanston. Griffen and Owens suggest that the brief video clips of the software displayed on the monitor could have come from their efforts in Evanston. They also could have come from Owens' work at Brumfield's office or from Brumfield's trying to make the program work. But they do not tell us whether or not the software was working and, in one instance, it apparently indicates that it was not working.

And, Brumfield and the others are unanimous in stating it was not working well enough to use it for commercial trading prior to March 2, 1999. Brumfield cannot now recall when he first traded using the new software, but he is "stone certain" that when he agreed to March 2, 1999, as the critical date, he then knew he had done no commercial trading using that software prior to that date. That recollection is akin to the evidence concept of past recollection recorded. March 2, 1999, is a conservative date. The actual date when the software was commercially usable and commercially used was probably well after that date.

The people involved in the development were not eccentric inventors unschooled in patent law, *see* FMC Corp. v. Hennessy Indus., Inc., 650 F.Supp. 688 (N.D.Ill. 1986), *vacated in part on other grounds*, 836 F.2d 521 (Fed. Cir. 1987). They were sensitive to the one year bar rule, and it is highly unlikely that they would have taken risks with the filing date. We are not persuaded that there is a substantial or even some likelihood that the invention was commercially exploited before March 2, 1999.

We turn, then, to consideration of whether plaintiff has established that it is likely to succeed on its contention that defendant infringes the patents. We conclude that it has. A patent infringement analysis involves two steps. "First, a court must determine as a matter of law the correct scope and meaning of a disputed claim term .... Second, the analysis requires

a comparison of the properly construed claims to the accused device, to see whether that device contains all the limitations, either literally or by equivalents, in the claimed invention." CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1365 (Fed. Cir. 2002) (internal citation omitted). "Claim construction is a matter of law" (Allen Eng'g Corp. v. Bartell Indus. Inc., 299 F.3d 1336, 1344 (Fed. Cir. 2002)) that must begin with the language of the claim. Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc., 222 F.3d 951, 955 (Fed. Cir. 2000).  We presume that the claim terms carry their ordinary meaning. Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 913 (Fed. Cir. 2004); CCS Fitness, 288 F.3d at 1366.  To determine that meaning, we focus on the claims and other intrinsic evidence of record. Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d 1313, 1325 (Fed. Cir. 2002).  We attribute to the claim "the meaning it would have to a person of ordinary skill in the art at the time of the invention." Innova/Pure Water, Inc. v. Safari Water Filtration Sys. Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004).  The claims are central to the claim construction analysis because they "define the invention to which the patentee is entitled the right to exclude." Id. at 1115.  The patentee, acting as his own lexicographer, may limit or expand the meaning of a term. Teleflex, 299 F.3d at 1325.  We are not obligated to interpret the claims "conclusively and finally during [this] preliminary injunction proceeding." Sofamor Danek Group, Inc. v. DePuy-Motech, Inc., 74 F.3d 1216, 1221 (Fed. Cir. 1996). See Oakley, Inc. v. Sunglass Hut Int'l, 316 F.3d 1331, 1345 n.3 (Fed. Cir. 2003) (quoting Jack Guttman, Inc. v. Kopykake Enters., Inc., 302 F.3d 1352, 1361 (Fed. Cir. 2002) ("a district court can issue 'tentative' or 'rolling' claim constructions when 'faced with construing highly technical claim language on an expedited basis.'")).

     We turn to the language of the claims, beginning with claim 1 of the '132 patent, which recites:

A method of placing a trade order for a commodity on an electronic exchange having an inside market with a highest bid price and a lowest ask price, using a graphical user interface and a user input device, said method comprising:
setting a preset parameter for the trade order

> displaying market depth of the commodity, through a dynamic display of a plurality of bids and a plurality of asks in the market for the commodity, including at least a portion of the bid and ask quantities of the commodity, the dynamic display being aligned with a static display of prices corresponding thereto, wherein the static display of prices does not move in response to a change in the inside market;

> displaying an order entry region aligned with the static display prices comprising a plurality of areas receiving commands from the user input devices to send trade orders, each area corresponding to a price of the static display of prices; and

> selecting a particular area in the order entry region through single action of the user input device with a pointer of the user input device positioned over the particular area to set a plurality of additional parameters for the trade order and send the trade order to the electronic exchange.

'132 patent, claim 1, col. 12, ll. 2-27.

Claim 1 of the '304 patent reads as follows:

> A method for displaying market information relating to and facilitating trading of a commodity being traded in an electronic exchange having an inside market with a highest bid price and a lowest ask price on a graphical user interface, the method comprising:

>> dynamically displaying a first indicator in one of a plurality of locations in a bid display region, each location in the bid display region corresponding to a price level along a common static price axis, the first indicator representing quantity associated with at least one order to buy the commodity at the highest bid price currently available in the market;

>> dynamically displaying a second indicator in one of a plurality of locations in an ask display region, each location in the ask display region corresponding to a price level along the common static price axis, the second indicator representing quantity associated with at least one order to sell the commodity at the lowest ask price currently available in the market;

>> displaying the bid and ask display regions in relation to fixed price levels positioned along the common static price axis such that when the inside market changes, the price levels along the common static price axis do not move and at least one of the first second indicators moves in the bid or ask display regions relative

> to the common static price axis;
> displaying an order entry region comprising a plurality of
> locations for receiving commands to send trade orders, each
> location corresponding to a price level along the common static
> price axis; and
> in response to a selection of a particular location of the order entry
> region by a single action of a user input device, setting a plurality
> of parameters of a trade order relating to the commodity and
> sending the trade order to the electronic exchange.

'304 patent, claim 1, col. 12, ll. 35-67, col. 13, ll. 1-3. As is evident from the claims above, the

'132 and '304 patents share common language. Our construction of the claims will focus on the

disputes over that language.

We first turn to the term "static display of prices," which plaintiff construes as "a

display of prices which has price levels that do not normally change positions in response to

new market information." Defendant construes the term as "a display of cells containing

prices, the values of which do not move or change unless the user enters a manual recentering

command." In their constructions, both parties seem to anticipate the impact of defendant's

automatic recentering feature. Plaintiff's version leaves open the possibility of movement, while

defendant's version forecloses all but manual recentering. Turning to the language of the

claim, claim 1 mentions only that the static display of prices "does not move in response to a

change in the inside market." Thus the claim provides only a situation in which the price

display does not move, and does not state that the display may never move. In its briefs

defendant ignores the qualification, "to a change in the inside market," and gives the inaccurate

impression that claim 1 requires the static price display to "never move" under any and all

circumstances. The limitation that the static price display "never moves" is found in dependent

claim 55, which, as plaintiff correctly observes, may not be read to limit the independent claim.

*See* Innova/Pure Water, Inc., 381 F.3d at 1123 (quoting Karlin Tech., Inc. v. Surgical

<u>Dynamics, Inc.</u>, 177 F.3d 968, 971-72 (Fed. Cir. 1999)).

With respect to manual recentering, the specification states that "static" means that the values in the price column "do not normally change positions unless a re-centering command is received" ('132 patent, col. 7, ll. 46-48). Plaintiff also describes that recentering command as a "one click centering feature," which suggests that a user enters the command with a mouse or similar device ('132 patent, col. 8, ll. 49-60). Dependent claims 24 and 34 mention recentering, but do not express a manual command limitation. And dependent claim 44 requires that a user provide a recentering instruction. There is no clear indication that the manual recentering command limits claim 1 or the definition of "static price axis." Thus, we construe "static display of prices" as a display of prices which has price levels or rows that do not normally change positions in response to new market information. We add the term "rows" as synonymous with "levels." Defendant contends that neither "levels" nor "rows" should be included in the definition of "static display of prices," and posits that "the issue is what 'prices' means." But the real issue is what "static display of prices" means, and we understand that phrase to include price levels, which is where the prices are located and displayed. In other words, the display of prices is a region in which prices, represented by numbers, are shown. For the reasons stated above, we also reject defendant's inclusion of a manual recentering limitation in its proposed construction of the phrase, "the static display of prices does not move in response to a change in the inside market."

According to the claim, a "dynamic display" of a plurality of bids and asks is "aligned" with the static display of prices that corresponds to the dynamic display. The parties disagree as to how the displays of bids and asks are related to the display of prices. Defendant's proposed construction posits unnecessary limits, as nothing in the claims requires that the bid

and ask displays be permanently wedded to a cell of the static price display. The dynamic bid and ask values constantly move up and down along the price axis, and if those values were "connected with and always unambiguously matched to a price value," as defendant contends, then the values in the price axis would be in constant motion, which is not the case. We construe the "dynamic display" term to mean a display of a plurality of bids and a plurality of asks that are aligned with and correspond to the static display of prices. In this sense, when the bid and ask prices move up and down in their respective columns they are not unambiguously matched with a specific price in the static price axis, although they are matched with some price.

Next we construe the "order entry region" section to mean an area that comprises a plurality of locations where users may place orders by way of a user input device, and that each location corresponds to a price in the static display of prices. Defendant attempts to limit the phrase so that cells into which users enter orders are always linked to a value in the static price axis, but the claim does not include that limitation. The words "aligned" and "corresponding" do not mean "unambiguously matched." It is improper for "courts to say that [claims] contain limitations which are not in them." Intervet America, Inc. v. Kee-Vet Laboratories, Inc., 887 F.2d 1050, 1054 (Fed. Cir. 1989).

We construe the terms "single action of the user input device" as an action by a user within a short period of time that may comprise one or more clicks of a mouse button or other input device. In the specification, plaintiff states that terms are not limited to a click of the mouse button, or even the use of the mouse as the input device ('132 patent, col. 4, ll. 12-19). Defendant's proposed construction allows for multiple mouse clicks, but also states, "an act by a user which sends a single computer command." That phrase "computer command"

improperly limits the terms, which focus primarily on the user's actions.

Turning to the '304 patent, we construe "common static price axis" as a line of prices comprising price levels that do not normally move when the inside market moves. The bid and ask display regions correspond to the price levels in the static price axis, which is why the static price axis is described as "common." The parties disagree over the meaning of "axis." In its proposed construction defendant describes "common static price axis" as "a single straight line of prices shared by the bid and offer quantity display regions, the values of each price cell do not move or change unless the user enters a manual recentering command." We reject the "manual recentering command" limitation for the reasons stated above. We also disagree with the description of the axis as a "line of prices" rather than "price levels," which is the term used in claim 1. Prices are the actual numbers that appear in the price levels. Defendant believes that the term "price level" "refers generically to price values or amounts, in whatever form they are displayed." Contrary to defendant's construction, that term is a generic reference to a horizontal level on which a designated price resides and not to just that price as represented by a number. To illustrate, plaintiff explains that "a right click in the AskQ column 1202 in the 87 price row will send a sell order to market at a price of 87 and a quantity of 150" ('304 patent, col. 10, ll. 46-48). "Similarly, a right click in the BidQ column 1201 at the same price level of 87 would send a buy limit order to market for a quantity of 5 at a price of 87" ('304 patent, col. 10, ll. 56-58). The price of 87 appears in neither column 1201 nor column 1202. Instead, it appears in column 1203, the price column. Here "price level" signifies the cell in column 1201 or column 1202 that is along the same horizontal plane as the price of 87. When plaintiff referred to a price, as in a specific number, rather than a horizontal level, it did not include the words "level" or "row." *See* '304 patent, col. 10, ll. 39-41 ("a left click on the 20 in the AskQ

column 1202 will send an order to market to sell 17 lots at a price of 90").[1] Thus, focus should be placed on price levels, rather than prices.

Our construction of "order entry region" of the '304 patent is similar to that of the analogous provision in the '132 patent. We construe the order entry region to mean an area comprising a plurality of locations where users may enter commands to send trade orders, and that each location corresponds to a price level along the common static price axis.

Finally, we construe "single action of a user input device" in the same vein as the similar provision in the '132 patent. "Single action of a user input device" means an action by a user within a short period of time that may comprise one or more clicks of a mouse button or other input device. We disagree with defendant's focus on the "computer command" rather than the user action and its deconstruction of a single mouse click into separate acts.

The next step of the infringement analysis requires us to compare the construed claims with the accused device. This comparison is a question of fact. Southwall Technologies, Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995). Literal infringement occurs when "each limitation of the claim [is] present in the accused device." Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1330 (Fed. Cir. 2001). "Literal infringement of a claim exists when each of the claim limitations 'reads on,' or in other words is found in, the accused device." Allen Eng'g Corp., 299 F.3d at 1345. Under the doctrine of equivalents, the accused product may also infringe if it has insubstantial changes from the patented device. Sofamor Danek Group, Inc., 74 F.3d at 1221. As with validity, after defendant has raised substantial

---

[1] This interpretation of "price level" also applies to the '132 patent, in which plaintiff uses identical language: "a right click in the BidQ column 1201 at the same price level of 87 would send a buy limit order to the market for a quantity of 5 at a price of 87" ('132 patent, col. 10, ll. 18-20); "a left click on the 20 in the AskQ column 1202 will send an order to market to buy 17 lots at a price of 90" ('132 patent, col. 10, ll. 1-3).

questions as to infringement, plaintiff must show that those substantial questions lack substantial merit. National Steel Car, Ltd., v. Canadian Pac. Ry. Ltd., 357 F.3d 1319 (Fed. Cir. 2004).

Attempting to tiptoe the fine line between valid design around, and infringement, defendant divided what was a single column of prices into two columns. Those columns are bounded to the left and right by vertically cascading bid and ask columns. And the prices within that bounded area still occupy price levels. Importantly, the prices in the middle two columns do not overlap one another, meaning that two different prices will never be horizontally adjacent to each other. Thus, the prices are still aligned with the corresponding bid and ask prices. Further, by splitting the single column into two columns, defendant did not change the number of price levels.

Defendant states that the prices in its device are not static because they move when the inside market changes, and they also move when the market drifts off the top or bottom of the screen. On the first front, defendant illustrates that after a trade is entered in its device, the price on the price level at which the trade was entered moves horizontally from one internal column to the other. But this horizontal adjustment occurs entirely within the region in which the prices are shown, and is thus contained with the "display of prices," which remains static. Further, and as discussed below in more detail with respect to the '304 patent, the price levels remain static, no matter the amount of internal lateral movement of prices it transpires, because the price merely moves horizontally along the price level.

In its second argument defendant emphasizes that the '132 patent allows for manual recentering, which means that when the inside market ascends or descends off the trader's screen, the trader may recenter that market by clicking the mouse ('132 patent, col. 8, ll. 49-60).

Defendant's system uses automatic recentering, a feature that automatically recenters the inside market in the event that it reaches the top or bottom of the trader's screen. As discussed in the claim construction section above, the manual recentering command does not limit the meanings of "static display of prices" or "common static price axis." But this does not mean that the plaintiff's patents read on automatic recentering.

Even though automatic recentering may be an improvement on the static display of prices and the common static price axis, it is not enough to raise a substantial question of infringement. If no need for recentering arises, then the price display would remain static. Recentering is a conditional and not a constant event. Automatic recentering does not transform the price into a "moving target," a common feature of prior art that incorporated a dynamic price axis. In the vast majority of instances traders using defendant's device will not have the price move at the very moment when they enter orders. Plaintiff has shown that defendant's product infringes unless and until automatic recentering occurs, and that is enough to demonstrate a lack of substantial merit in defendant's claim.

With respect to the "common static price axis" of the '304 patent, defendant forcefully argues that by creating two price columns, its system lacks an axis. However, splitting the central column did not change the number of price levels, and it is the price levels that matter. There remains one column/axis of price levels. Similarly, defendant also contends that it does not infringe because its bid and ask regions do not correspond to a "common static price axis," as required by the '304 patent ('304 patent, claim 1, col. 12, l. 44; col. 12, l. 51) because it lacks a common axis. But defendant's division of the single column into two columns affected no substantial change, and the two columns together comprise a common axis of price levels to which the adjacent bid and ask columns correspond.

Despite defendant's addition of a pop-up window, plaintiff has shown that defendant's non-infringement defense as to the "order entry region" element of the '132 and '304 patents lacks substantial merit. Defendant argues that its pop-up window is not aligned with or corresponding to a the static price display and thus does not infringe the order entry region element of the '132 patent. While the pop-up window may not correspond or align with the price display, the fact remains that a user still enters an order by clicking in one of many cells that serves as an area to receive orders. Defendant argues that clicking on such a cell only activates the pop-up window, and that another action is required to enter an order. However, a user may enter an order regardless of the pop-up window simply by clicking on an order entry cell. To place an order at the default quantity, a user may disregard the pop-up window. Defendant also argues that "the bid and ask price columns of the defendant system are not separate from and do not correspond to a price column; they are the price columns." But the claim states that the plurality of areas each correspond "to a price of the static display of prices," which does not preclude the order entry region corresponding to a price level.

Defendant is correct to observe that the differences in language between the '304 patent and the '132 patent are not material. Our conclusion with respect to the order entry pop-up window is no different for the '304 patent. The doctrine of claim differentiation benefits plaintiff with respect to the '304 patent. Dependent claim 15 states: "The method of claim 14 wherein the bid order entry region overlaps with the bid display region and the ask order entry region overlaps with the ask display region" ('304 patent, claim 15, col. 13, ll. 61-63). Claim 14, which focuses on the order entry region, is dependent on claim 1. Claim 1 does not specify that the order entry regions must overlap with the price display regions. Under the doctrine of claim differentiation, the narrow claim (15) cannot limit the broader claim (1), and thus it is improper

to read the "overlap" limitation into claim 1. The fact that defendant's system allows order entry in the bid and ask price columns, which do not overlap with the bid and ask display columns, does not avoid infringement of claim 1.

Turning now to the "single action of a user input device" element that is present in both patents, defendant focuses on its pop-up window and states that "there are multiple steps to order entry" in its system. But those multiple steps are not user steps and are instead computer steps that are related to its pop-up window, which, as discussed above, is an optional feature that may be ignored for orders placed at the default quantity. When the user clicks on a cell, defendant states that "this action sends a command that prompts the software to display the pop up window, showing potential order quantities." Defendant differentiates its system based on what the software does and not the user's actions. Defendant's focus on the "computer command" that follows a user action is clear from its proposed claim construction. After the pop-up window appears, the user may place an order at the default level by simply releasing the mouse button, which up to this point has been depressed. Any automatic movement of the pointer to the pop-up window cannot be construed as a user action. It is true that the pop-up window enables the trader to change the quantity of his order, but this is an optional, not a required, step, and does not add a user action. If the pop-up window required more than completing the mouse click, then defendant would have a much stronger case for multiple action order entry. But as it stands, a user may complete an order with defendant's system with a single user action by clicking a mouse, and that fact evidences the lack of substantial merit for the non-infringement defense as to the "single action of the user input device" element of the '132 patent and '304 patents.

Even if defendant's order entry technique could be construed as involving more than

one mouse click, such action would be covered by plaintiff's preferred embodiment, which states, "any action by a user within a short period of time, whether comprising one or more clicks of a mouse button or other input device, is considered a single action of the user for the purposes of the present invention" ('132 patent, col. 4, ll. 15-19; '304 patent, col. 4, ll. 19-23). Plaintiff has thus shown that defendant's non-infringement defense lacks substantial merit and in light of its showing of validity has demonstrated likelihood of success on the merits.

The two most critical factors in determining whether to grant or deny a preliminary injunction are the likelihood of success and irreparable harm. Reebok Int'l, Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994).

Defendant's new programs have just entered the market, and we do not know what success, if any, there may have been. Plaintiff is concerned about loss of market share, particularly if defendant markets its programs at no cost or a reduced price, linking its programs to a cash exchange in which it has proprietary rights. But possible loss of market share and speculation that such losses might occur do not amount to proof of special circumstances. Nutrition 21 v. United States, 930 F.2d 867, 871 (Fed. Cir. 1991). Indeed, given the court's assessment of plaintiff's likelihood of success, defendant may hesitate to attempt to penetrate the market in any meaningful way.

Plaintiff does not, however, need to prove irreparable harm. When a patentee has made a clear showing of patent validity and infringement, and we believe plaintiff has done so here, irreparable harm is presumed, so as to protect its exclusivity rights. Amazon.com v. Barnesandnoble.com, 239 F.3d 1343, 1350 (Fed. Cir. 2001). That presumption is rebuttable and

the granting of licenses, a large market share for plaintiff, a minuscule share for defendant, twelve major non-infringing competitors and the availability of a damages remedy were enough to rebut the presumption in <u>Rosemount, Inc. v. U.S. Int'l Trade Commission</u>, 910 F.2d 819, 822 (Fed. Cir. 1990). Later, however, in <u>Polymer Technologies, Inc. v. Bridwell</u>, 103 F.3d 970 (Fed. Cir. 1996), the bases for rebutting the presumption were limited to three (with a recognition that "similar" exceptions might qualify): the infringer has ceased or will soon cease infringing, the plaintiff has indicated a willingness to give up its exclusivity and has established the price that will cause it to do so by granting non-exclusive licenses, or it has unduly delayed in bringing suit. Neither the first nor the third basis is present here.

Accordingly, we decline, for now, to issue a preliminary injunction. We emphasize "for now." The views

expressed here may well cause defendant, as well as others plaintiff claims are infringing, to reconsider their plans. And if defendant chooses instead to confront plaintiff in the marketplace, then this court will have to reconsider its present belief that there has not been a sufficient showing of irreparable harm.

_James B. Moran_
**JAMES B. MORAN**
Senior Judge, U. S. District Court

_Feb. 9_, 2005.