

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

TRADING TECHNOLOGIES )
INTERNATIONAL, INC., )
             )
        Plaintiff, )
             )
        vs. )     No. 04 C 5312
             )
eSPEED, INC., eSPEED INTERNATIONAL, )
LTD, and ECCO WARE, LTD., )
             )
        Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Trading Technologies International, Inc. ("TT") brought suit against eSpeed, Inc., ITSEcco Holdings Limited, Ecco LLC, and EccoWare Ltd. (collectively "eSpeed"), alleging infringement of U.S. Patent Nos. 6,766,304 ('304) and 6,882,132 ('132). Both parties have filed a number of summary judgment motions in an attempt to limit the scope of the trial. Today we deal with the parties' cross-motions for summary judgment of invalidity/validity. Defendants assert that GL Win with Trade Pad constitutes prior art, and that such prior art was offered for sale prior to the critical date[1] of plaintiff's patents. If defendants can prove their contention, such a sale would invalidate plaintiff's patents under 35 U.S.C. § 102(b). Plaintiff contests both that GL Win with Trade Pad constitutes prior art and that Trade Pad was sold or offered for sale prior to the critical date. For the reasons stated herein, we deny eSpeed's motions for summary judgment that TT's patents are invalid based on GL Win with Trade Pad prior art and deny TT's cross-motion that Trade Pad was not sold or offered for sale prior to the critical date.

---

[1] The parties have previously submitted, and we have denied, summary judgment cross-motions regarding the priority date of TT's patents. Trading Technologies Int'l, Inc. v. eSpeed Inc., No. 04-5312 (N.D.Ill. July 12, 2007). Although eSpeed contends that the correct priority date is June 9, 1999, rather than March 2, 1999, as asserted by TT, eSpeed's current motion accepts a priority date of March 2, 1999.

## BACKGROUND

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" such that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). For purposes of summary judgment, we construe the facts in favor of the non-movant (Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)) and draw all inferences and view underlying facts in the light most favorable to the non moving party. U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962). The mere existence of some factual dispute will not frustrate an otherwise proper summary judgment; only a genuine dispute over a material fact will defeat summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).

Generally, we set forth a narrative of undisputed facts garnered from the statements submitted by the parties pursuant to Local Rule 56. Although the parties complied with Local Rule 56, out of almost 150 lengthy alleged statements of material facts, only a handful were not disputed. Therefore, we find it nearly impossible to set forth a background of undisputed facts. Rather, we set forth the alleged "facts" in the discussions section below.

## DISCUSSION

Section 102(b) of the patent law states: "A person shall be entitled to a patent unless – (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). Defendants' current motion focuses on the "on sale" bar of § 102(b). Because a patent is presumed valid (35 U.S.C. § 282) to succeed in their challenge, defendants "must demonstrate by clear and convincing evidence that 'there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the

claimed invention.'" Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1045-46 (Fed.Cir.2001) (quoting UMC Elecs. Co. v. United States, 816 F.2d 647, 656 (Fed.Cir.1987)). Determining whether an invalidating prior art was placed on sale before the critical date is a conclusion of law based on underlying facts. Minnesota Min. & Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1301 (Fed.Cir.2002).

Defendants here argue that GL Trade, a competitor of plaintiff and a defendant in a related patent infringement case, developed a trading module called "Trade Pad," which was contained in its front-end trading system known as "GL Win."[2] Defendants base their on-sale challenge on an alleged sale of GL Win with Trade Pad to Cargill Investment Services, Inc. ("CIS") as part of a global contract executed on February 17, 1999. Because the contract was executed more than two weeks prior to the critical date of the patents-in-suit, defendants' success on this motion would invalidate plaintiff's patents.

While § 102(b) on-sale challenges often allege that the inventor sold his or her product prior to the critical date, an on-sale bar may also result from "activities of a third party which anticipate the invention, or render it obvious." In re Epstein, 32 F.3d 1559, 1564 (Fed.Cir.1994). If GL Win with Trade Pad anticipated TT's patented technology, § 102(b) may create a bar to patentability by itself, or, if TT's patented technology would have been obvious from GL Win with Trade Pad in conjunction with prior art, § 102(b) may work in combination with § 103 to create a bar to patentability. See KeyStone Retaining Wall Systems, Inc. v. Westrock, Inc., 997 F.2d 1444, 1451-52 (Fed.Cir.1993).[3]

---

[2]"Trade Pad" is interchangeably referred to as "Trade Pad," "Trading Pad," and "Tradepad." "GL Win" is also cited as "GLWIN" and "GL WIN."

[3]35 U.S.C. § 103(a) states: "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

Nearly ten years ago, in <u>Pfaff v. Wells Electronics, Inc.</u>, the Supreme Court shifted the on-sale bar test from a "totality of the circumstances" test to a two-part inquiry: (1) whether the invention was the subject of a commercial offer for sale and (2) whether the invention was ready for patenting. 525 U.S. 55, 67 (1998). A single sale or offer to sell is sufficient to invalidate a patent. <u>Intel Corp. v. U.S. Intern. Trade Comm'n</u>, 946 F.2d 821, 830 (Fed.Cir.1991). Additionally, an offer for sale, generally determined under the rules of the Uniform Commercial Code (<u>Minnesota Min. & Mfg. Co.</u>, 303 F.3d at 1307), is sufficient under § 102(b). Even if "no delivery is made prior to the critical date, the existence of a sales contract or the signing of a purchase agreement prior to that date has been held to demonstrate an 'on sale' status" for the prior art. <u>Buildex Inc. v. Kason Industries, Inc.</u>, 849 F.2d 1461, 1464 (Fed.Cir.1988).

The parties' dispute primarily centers on <u>Pfaff</u>'s first prong: was the invention the subject of a commercial offer for sale? GL, in its brief in support of eSpeed's motion, argues that "eSpeed provides evidence that: 1) on February 17, 1999 GL and CIS entered into a contract in the United States; 2) the contract was for GL's GL WIN trading station, which contained the *Tradepad* software application; and 3) *Tradepad* contained the elements of the patents-in-suit" (GL's reply at 45). GL correctly sets forth the determinations to be made to satisfy <u>Pfaff</u>'s first prong. A further finding that Trade Pad was ready for patenting would then entitle eSpeed to summary judgment of invalidity.

We begin with the contract. Did GL and CIS enter into a contract in the United States? The answer is yes. There is no real dispute that GL and CIS entered into a contract for the license of GL software to run for 18 months from the date of the contract. "It is well settled that a sale is a contract between parties to give and to pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold." <u>In re</u>

Caveney, 761 F.2d 671, 676 (Fed.Cir.1985) (citing 77 C.J.S. Sales § 1 (1952)). Here, the GL-CIS contract provided a "non exclusive worldwide license for the use of software programs, hereinafter called 'SOFTWARE'[4] and described in Addendum I, and a right of use of certain market information described here under" (eSpeed exh. 59, at G106264), in exchange for a prescribed rental fee (*id.*, at G106265). The rental fee also covered "Extra Services," which was defined as "the service provided by the Supplier for the maintenance, upgrade and support of the Software Modules under the Addendum I hereto" (*id.*, at G106264).

Defendants correctly state that lease or rental of computer trading software, as seen in this contract, may be considered a "sale" under § 102(b). *See* Minton v. National Ass'n of Securities Dealers, Inc., 336 F.3d 1373 (Fed.Cir.2003) (conveyance of a fully operational computer program implementing and embodying the claimed method was an offer for sale within the meaning of § 102(b)); In re Kollar, 286 F.3d 1326, 1331, n3 ("In certain situations, a 'license' in the latter sense of the word may be tantamount to a sale (*e.g.*, a standard computer software license), whereupon the bar of § 102(b) would be triggered because '[t]he product is...just as immediately transferred to the 'buyer' as if it were sold'") (internal citations omitted).

The next query, whether the contract included the Trade Pad software application, is heavily contested and requires acknowledgment and assessment of the parties' flood of supporting exhibits. We begin with the contract itself, which does not specifically mention Trade Pad or a method or display of a vertical price axis. Addendum I-Schedule 1 sets out the software included with the license and specifically cites "the GLWIN Market Feed Station" and "the GLWIN Trading Station" (eSpeed Exh. 59, at G106273). The contract describes the

---

[4]The contract defines "Software" as "the computer program or programs referred to in Addendum I-Schedule 1 together with the manual or manuals and other documents associated with the program as revised from time to time" (eSpeed Exh. 59, at G106264).

GLWIN Market Feed Station:

> This software program runs on a PC unit under the WINDOWS operating system. It is linked to the GL Feed Gateway module through the Client local network. It includes the following main functions:
> - market information display of the data supplied by the Exchange Market feed on specific designed pages and captured through the Client gateway access
> - display of the equities executions during a current session, with graphics
> - historical information (High Lows and Volumes) of all equities available on the market Feed
> - alert ticker with parameters entered by the Client which triggers whenever a price limit or traded volume is reached on the market.

(*Id.*). The contract describes the GLWIN Trading Station:

> This module can be integrated on the same unit running the above described module, with the same Client/Server architecture. In this case a dialogue session is also made with the GL order Gateway module. It includes all the above described functionality with the main following ones:
> - order entry to be traded on the order driven market. The available trading rules are the ones stated by the Exchange for the concerned market platform.
> - display of the Client market positions entered and related executions, including acknowledgments and rejects
> - modification and cancellation of positions which have already been acknowledged by the central Exchange engine with a returned reference, and which are still in the electronic global market book. (i.e. not yet hit or executed)
> - order inputs with price and volume parameters entered by the Client. The orders are automatically sent on the Exchange whenever a market limit is reached
> - alert ticker which triggers for each answer returned by the market. The message replies can, be displayed during the trading hours and saved in a file for the current session.
> - sort on the transactions by selecting one or more of the following parameters: Value, Counterpart, Client own reference and price. This information is stored in a file during the current session, and is accessible for the Client Back Office process through other modules described below.

(*Id.*). Clearly, there is no specific mention of Trade Pad or a static price ladder functionality.

TT points to the failure to specify the "Trade Pad" module as evidence that Trade Pad

was not included in the GL-CIS contract. In analyzing a contract, Illinois courts generally

hold that interpretation should go no further than the contract's "four corners." Cortez Prods.

v. Monterey Peninsula Artists, Inc., 2004 WL 609375, *2 (N.D.Ill. 2004). The language of the
agreement is presumed to speak the intent of the parties, and only where language of the
contract is ambiguous do we look to outside evidence or turn to the fact-finder. Air Safety, Inc.
v. Teachers Realty Corp., 706 N.E.2d 882, 884 (Ill.1999). Ambiguity only exists where the
language of the contract is susceptible to more than one meaning (id.); that the parties disagree
on the intent behind the contract does not create an ambiguity. Camico Mut. Ins. Co. v.
Citizens Bank, 2006 WL 1006014, *2 (N.D.Ill.2006).

In this case, neither party suggests that the contract is ambiguous – defendants assert
that the Trade Pad module was clearly included as a window of the GL Win system; plaintiff
contends that Trade Pad is not specifically included and therefore, is excluded. We begin with
defendants' explanation. eSpeed has submitted testimonial evidence that GL Win was the
trade name for GL's trading station, which was composed of a number of modules, including
Trade Pad. Because GL Win included all of the modules, eSpeed contends, the contract did
not need to specify any particular module. In fact, defendants assert, it is telling that the
contract did not mention any specific windows, including MarketWatch, GL Nego, or Best
Limits Window. Gerard Varjacques, CEO of GL Trade, explained:

> [T]he GL WIN is the package, and as such all of the modules – all of the
> modules that are components of this package are included in the contract that
> was signed. So there was no need to mention specifically Trade Pad, as we don't
> mention specifically MarketWatch, which is another module of GL WIN, or the
> MarketDepth window, or any other module among the fourteen different
> modules that are part of this GL WIN ensemble.

(eSpeed exh. 20, at 498-99).

Because Trade Pad was not explicitly stated in the contract, each side of this dispute
points to external evidence to prove its point. With respect to the contract, TT suggests that
the "GL Win Trading Station," specifically included in Addendum I-Schedule 1 of the

contract, is synonymous with GL Nego, GL's primary trading module at the time of the contract. Therefore, TT submits, Trade Pad could not be part of the GL Win Trading Station because it was separate from GL Nego. In support of its argument of synonymity, TT points to oral testimony and documentary evidence. TT submits the deposition testimony of Jean Cedric Jollant, former GL employee, who indicated that GL NEGO was a "trading station" (TT exh. X, at 220-21). TT also submits the testimony of Barbara Wattiez, former GL employee and trainer, who, in response to the question as to whether "Trading Station" was another name for "GL Nego," responded, "Yes, the trading station was GL Nego, Nego was part of the trading station" (TT exh. HHHH, at 121). Additionally, TT looks at a GL informational brochure for GL Win users, which notes, "The Trading station remains the same: GL NEGO" (TT exh. FFF, at G107566). Similarly, a GL newsletter entitled, "GL Release News no4," noting release of GL Win version 4.51 on April 21, 2000, noted that the title of GL Trading station was renamed for the English version, "The trading station, previously titled « Glnego » in english, was renamed the GL Trading Station" (TT exh. GGG, at G90857). Finally, TT points to the deposition testimony of Christina Dobson from CME, who testified that GL was not offering the Trade Pad module free of charge (eSpeed exh. 44, at 79)[5], and therefore, TT argues, it should have been specified if it was meant to be part of the GL-CIS contract.

eSpeed refutes the meaning of plaintiff's alleged evidence that GL's "Trading Station" is synonymous with "GL Nego," suggesting that TT failed to give context to its arguments. In addition to noting that the Addendum I-Section 1 included "the GLWIN Market Feed

---

[5] eSpeed points to Dobson's testimony in an attempt to establish that GL also offered Trade Pad for sale to the CME prior to the critical date of the patent. While such evidence may serve to corroborate that Trade Pad was included as a module in GL Win as of the GL-CIS contract, like defendants' complaints about TT's rebuttal witnesses, addressed below, CME employees had no specific knowledge of the CIS contract or offer for sale.

Station," as well as "the GLWIN Trading Station," defendants submit Jollant's testimony to explain the relationship between GL Trade Pad and GL Nego, both contained within GL Win. Jollant explained that all GL Win windows leverage the order entry capability of GL Nego. In other words, placing an order using the Trade Pad window would essentially invoke the order entry of GL Nego as a mechanism for sending the order to the Exchange (eSpeed exh. 81, at 104-105). eSpeed points to the second sentence of the 1999 GL Win manual cited by TT, which allegedly corroborates Jollant's explanation: "The trading features remain the same whether it is to buy, sell, cross: F5 of +, F9 or – and F6 or mouse trade from the following windows: -Market Watch or -Market Summary or -GL NEGO VF" (TT exh. FFF, at G107566). The same manual also points to Trade Pad as an alternate window from which to trade. Therefore, eSpeed argues, TT cannot invent attorney argument to create a genuine issue of material fact (eSpeed reply, at 11) (citing Scherer v. Rockwell Int'l Corp., 975 F.2d 356, 361 (7th Cir.1992); Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc., 45 F.3d 1550, 1562 (Fed.Cir.1995)). eSpeed's explanation is persuasive.

In support of its contention that Trade Pad was included in the February 17, 1999, GL-CIS contract, defendants rely heavily on testimonial evidence.[6] Varjacques testified that CIS contracted for "the most current version and all of these subsequent versions" of the GL products listed in the financial schedules, including GL Win (GL exh. E, at 75-77) and

---

[6]TT seemingly attempts to answer testimony of defense witnesses regarding Trade Pad by arguing that "trade pad" and "trading pad" are generic terms for order entry pads, rather than representative of a novel trading module run through GL Win. In support of such an argument, TT points to deposition testimony and explanatory brochures of other products. For example, GL's CEO, Varjaqcues, indicated that the term "Tradepad" could be used to represent the order entry pad, as shown in GL's MOSAIC module (TT exh. UU, at 242). Elliot Lapan explicitly stated that the term "Trade Pad" is a "generic term" for an "order entry pad" (TT exh. M, at 177). Lapan explained: "Generally what I've seen what's called a Tradepad is the bid, ask and stuff we talked about before, a little box where the bid, ask, hit, take. But it's a generic term" (id., at 177-78). In addition to the MOSAIC product, which advertises a "Trade Pad" "for sending orders to the market," but does not show a vertical static price axis (TT exh. KK), TT points to similar uses of the term "Trade Pad" as shown in GL's Thompson ONE MosaiX module (TT exh. LL, at G22447) and "PhotonTrader" (TT exh. OO). While TT's argument is interesting, it does not establish that GL did not use a known industry term to title a new product for that industry.

affirmed that the GL-CIS contract included all of the modules of GL Win (ES, exh. 20, at 505).

Varjacques testified that there was no intent on GL's part to exclude Trade Pad from the GL Win Market Feed Station and GL Win Trading Station specifically stated in the contract (*id.*, at 505, 519). Witnesses from CIS confirmed that the GL-CIS contract included all current modules of GL Win. Fred Mastro, former CIS employee who worked with Varjacques to negotiate the technology included in the contract, testified that the parties never discussed excluding any of the windows included in GL Win (eSpeed exh.54, at 31-32), including Trade Pad (*id.*, at 38, 42). Chris Malo, signatory to the GL-CIS contract, testified that he executed the GL-CIS contract for the GL front-end solutions on February 17, 1999 (eSpeed exh. 43, at 19). Defendants also point to testimony from Wattiez, who stated that she trained people on GL Win with Trade Pad beginning in February 1999 (GL exh. G, at 77-79), and would have trained Mike Cartier at CIS on GL Win 4.50, before she sent him the related manual on March 30, 1999 (eSpeed exh. 77, at 60).

Because eSpeed relies on testimonial evidence that the GL-CIS contract included the most current version of the GL Win system, eSpeed must show that Trade Pad existed as part of GL Win at the time of the contract. To do that, eSpeed relies on the testimony of Mike Glista, former CIS employee responsible for testing the GL Win system prior to CIS' entry into the contract, along with additional testimonial evidence and contemporaneous documentary evidence.

We begin with Glista's testimony. Glista testified that he evaluated a module called Trade Pad as part of the GL Win product he was evaluating prior to the February 1999 contract (eSpeed exh. 58, at 27-28). According to his testimony, it was Glista's responsibility to evaluate electronic trading products for CIS, specifically to review the front end, review the risk management, and review how it would impact the trade flow coming out of any of the

systems CIS already had in the Exchanges (*id.*, at 11). Glista first met with GL Trade in February 1998 at GL Trade's Paris office (*id.*, at 18). Thereafter, Glista testified that he evaluated the GL Win product, including Trade Pad (*id.*, at 27), to "kick the tires of a product" (*id.*, at 28) prior to CIS' entry into the contract. According to Glista, the GL Win system was installed on his Chicago desktop, through which he could trade into the live matching engines of the Exchange and review the results (*id.*, at 29). Glista described the Trade Pad module as having "a vertical price ladder with bids to the left of the price ladder and offers to the right of the price ladder," where "[t]he price ladder remained consistent and stable even when the market – the inside market went off the screen..." (*id.*, at 31). Both Mastro and Chris Malo, CIS signatory to the GL-CIS contract, affirmed that Glista was involved in such evaluation prior to February 17, 1999 (eSpeed exh. 54, at 55; eSpeed exh. 43, at 23).

Upon review of the initial Trade Pad product, which, according to Glista, did not allow a trader to change the default quantity of the trade, Glista made several recommendations to GL regarding the product (eSpeed Exh. 58, at 43). GL Trade then installed a new version of Trade Pad on Glista's Chicago computer, which addressed several of Glista's concerns, including default quantity adjustment. (*Id.*, at 45). The second installation also occurred prior to the execution of the GL-CIS contract. (*Id.*). According to defendants, Glista's feedback was consistent temporally with enhancements made to the Trade Pad module. (See eSpeed combined response, at 5) (pointing to the back-up source code).

In addition to Glista's testimony, eSpeed relies on testimony from Bruno Spada, chief technical officer for GL Trade Americas, who testified that all versions of GL Win, beginning with version 4.20, contained the Trade Pad application. (GL exh. L, at 29). Jollant testified that, in conjunction with Laurent Havard, he was involved in the development of the Trade

Pad application beginning in June of 1998. (GL exh. D, at 44). And Havard, primary inventor of the Trade Pad module, testified that, as December 7, 1998, the Trade Pad application was ready for integration and testing. (GL exh. C, at 124-25).

We pause to note that the law generally requires that oral testimony of invalidity must be corroborated. *See* Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc., 322 F.3d 1335, 1350 (Fed.Cir.2003) ("A review of the relevant case law reveals a clear requirement that such oral testimony by interested parties must be corroborated by documentary testimony"); Finnigan Corp. v. International Trade Comm'n, 180 F.3d 1354, 1366 (Fed.Cir.1999) ("The law has long looked with disfavor upon invalidating patents on the basis of mere testimonial evidence absent other evidence that corroborates that testimony"); Woodland Trust v. Flowertree Nursery, Inc., 148 F.3d 1368, 1371 (Fed.Cir.1998) ("Corroboration of oral evidence of prior invention is the general rule in patent disputes"). The need for corroboration holds true regardless of whether the party testifying is interested in the outcome of the litigation or is uninterested, but testifying on behalf of an interested party. Finnigan Corp., 180 F.3d at 1367. And the Federal Circuit has held that oral evidence of additional interested witnesses cannot act as sufficient corroboration for another's testimony. Lacks Industries, Inc., 322 F.3d at 1350 (Special Master did not err in not accepting the testimony of one witness to corroborate that of another). Therefore, eSpeed must corroborate the oral testimony through the submission of documentary evidence that Trade Pad was included in GL Win as of February 17, 1999, and that it was specifically included in the GL-CIS contract. Because TT's complaint that "every single snippet of the testimony eSpeed relies on is from similarly interested parties who have past associations with the defendants, or are being represented by defendants' counsel, and/or are simply being paid outright by defendants" (TT's opposition brief, at 4), is essentially true, and defendants' must

prove invalidity by clear and convincing evidence (Group One, Ltd., 254 F.3d at 1045-46), defendants' responsibility to produce solid documentary support is quite high.

In an attempt to meet that burden, defendants point to (1) internal delivery documents, (2) back-up source code from 1998 and 1999, and (3) 1999 manuals and user guides. Havard testified that on December 7, 1998, the Trade Pad application was copied onto a server used by the integration and testing team. (GL exh. C, at 124-25). The testimony referred to and relied on an internal delivery log, generated by the software developer each time the software was delivered to the integration and testing team. The December 7, 1998, delivery was the first Trade Pad delivery, and was noted in the delivery log, maintained in the ordinary course of business at GL, as "Trade Pad.txt." (Id., at 120-128).

Defendants also submit testimony and inspection/demonstration videos of source code from the 1998-1999 time period. According to testimony from Havard, the source code was contained on a number of nonrewriteable CDs, which were maintained in a locked cabinet in the Paris GL office. The CDs were prepared in the ordinary course of business and contained daily back-ups of all the source code of the GL Win modules from the relevant time frame (eSpeed exh. 14, 25-53). On March 15, 2007, the parties were able to inspect the contents of the backup CDs, and videos of those inspections have been reviewed by this court for purposes of assessing this motion. Although difficult to thoroughly assess without instruction, the videos seemingly show a static price axis similar to that described by the patents-in-suit.

Finally, defendants submit GL Win manuals and user guides to suggest that Trade Pad was included in GL Win at the time of the CIS contract. While the November 1998 GLTrade LIFFE[7] CONNECT for Equity Options User Guide V4.30 did not include the Trade Pad application (ES, exh. 53), GL Trade LIFFE CONNECT for Futures User Guide V.4.50 Beta

---

[7]LIFFE stands for the London International Financial Futures Exchange.

did showcase something called "The Trading Pad." (TT Exh. PPP, at G25645). The guide described the tool as "a novelty of GL," explaining that it "allows the trader to quickly position himself on the market for a specific contract. Prices, displayed in table format tick by tick highlighting best bid/offer, enable the trader to send offers on different prices and quantities with minimum effort." (*Id.*). Marcel Tchitchiama testified that the 4.50 user guide for LIFFE members was available to clients, prospective clients, and traders in January 1999 when it was created (eSpeed exh. 37, at 42-43). Tchitchiama further testified regarding a showcase of ISVs on the trading floor of LIFFE CONNECT on January 20, 1999, in which the 4.50 beta guide was distributed. (*Id.*, at 48-49).

Defendants also point to a GL manual regarding trading on the French MATIF Exchange that was allegedly delivered to CME on March 15, 1999 and delivered to Mike Cartier at CIS on March 30, 1999. Cartier, referring to an e-mail originated by Wattiez, testified that he received a GL manual for version 4.50 for MATIF on March 30, 1999 (eSpeed exh.42, at 59). Although Cartier testified that he could not recall if he ever saw Trade Pad before receiving the manual, he noted that the manual does contain a reference to Trade Pad (*id.*, at 61-62). The manual describes "The Tradpad" as "a new window offering you the possibility to visualise the market and trade in a different way" (TT exh. U, at MC 96). The description is followed by two screen shots showing a vertical price axis and a description of how to trade and how to modify or cancel an order sent from the Tradepad (*id.*, at MC 97-98). Defendants contend that the oral testimony, corroborated by the contemporaneous documentary evidence, undoubtedly establishes that (1) Trade Pad was a module of the GL Win system as of February 17, 1999; that (2) CIS contracted for all modules of the GL Win system on February 17, 1999; and that, therefore (3) CIS contracted for Trade Pad.

TT disputes the accuracy of the oral testimony and the authenticity and reliability of

the documentary evidence. We begin with plaintiff's challenges to defense witnesses' oral testimony. TT asserts that the oral testimony has been contradicted or can be impeached and that significant time has elapsed since the events witnesses have been asked to recall occurred – two considerations the Federal Circuit has used in assessing corroboration. *See* Lacks Industries, Inc., 322 F.3d at 1349; Woodland Trust, 148 F.3d at 1371. Specifically, plaintiff asserts that the time-line espoused by Mike Glista is contradicted by other testimony and documentary evidence.

TT argues that the internal inconsistencies in Glista's own testimony establish that he could not have evaluated Trade Pad prior to February 17, 1999. In fact, plaintiff is so confident that its evidence can prove an alternate time-line for the evaluation of the Trade Pad module, it has cross-moved for summary judgment on the issue. TT bases its confidence on the following sections of Glista's testimony. Glista testified that during the time he was evaluating GL Trade Pad, he dealt with Barbara LaPointe, a Chicago GL sales representative (TT exh. XXX, at 106). LaPointe, however, was a Transmarket employee through at least December 20, 1999 (TT exh. ZZZ, at G83887), and therefore could not have been the GL sales representative working with Glista prior to the February 17, 1999, contract. Similarly, when asked whether he was familiar with any other order entry front-ends offered by other software vendors at the time he was evaluating GL's Trade Pad, Glista responded that he was aware of RanOrder and YesTrader (TT exh. PP, at 121). YesTrader, however, was not incorporated until December 20, 1999 (TT exh. HHH, at 1), and did not open for business until 2000 (TT exh. QQ, at G111039). Further, TT suggests that Glista's memory is generally faulty and cannot be trusted. For example, TT suggests that Glista testified that he knew about TT's patents before they were patented and heard about Brumfield's open letter to the futures industry before it had been published.

TT also suggests that Glista's testimony cannot be believed because it is contradicted by testimony from other witnesses. For example, Glista testified that the first version of Trade Pad installed on his computer in Chicago did not allow a trader to change the default quantity for the trade (eSpeed exh. 58, at 43). In fact, Glista testified that he did not approve the first version of the Trade Pad screen primarily because its default quantity could not be changed (id.). Havard, however, testified that as of "[t]oday I don't think that in 1998/1999 there has been a version of TradePad where you could not change the default value" (TT exh. ZZ, at 16). Further, Glista testified that, to the best of his knowledge, the bid quantity was blue and the ask quantity was red in the Trade Pad (TT exh. PP, at 41-42), which did not match with the coloration contained in the screen shot taken by eSpeed of recompiled Trade Pad code produced by GL (TT exh. YY). Taking all of Glista's alleged mistakes in his time-line, TT suggests that Glista was actually reviewing an enhancement of GL Win sometime in 2000, or was evaluating GL's Mosaic product which was released in 2000 (see TT response, at 11-12; TT surreply, at 5).

Defendants respond by arguing that Glista continued to evaluate Trade Pad through and beyond the date of the contract.[8] (See eSpeed exh. 69, at 61) ("I was getting continuous version releases from GL Trade. This is a version release that we would have gotten after we had signed the contract between GL and CIS"). eSpeed argues:

> TT seeks to seize upon ambiguity in questions and answers about "evaluation periods" and what Mr. Glista could and could not have done during that evaluation period. TT's entire argument depends on its assumption that the

---

[8]Defendants also suggest that, even assuming TT's argument that Glista did not receive Trade Pad until 2000 is correct, it is irrelevant as the question for the on-sale bar is not when a product was delivered, but rather when it was acquired (eSpeed response to TT's cross-motion, at 4). While defendants may correctly state the law (Buildex Inc., 849 F.2d at 1464), they seemingly miss the point of TT's focus on impeaching Glista's testimony of evaluation prior to the GL-CIS contract. As we read the arguments and assess the evidence, eSpeed must rely on Glista's testimony to establish that Trade Pad was included in GL Win at the time of the contract. Without such testimony, eSpeed's probability of success on summary judgment is greatly diminished.

only time Mr. Glista looked at and evaluated Trade Pad was before the Cargill contract was signed and at no time later, i.e., when Ms. LaPointe was employed by GL or when YesTrader was formed in December 1999.

(eSpeed response to TT's cross-motion, at 5). Defendants also reassert the temporal connection between Glista's early suggestions and Trade Pad enhancements. Although Glista and defendants attempt to explain away the inconsistencies in Glista's testimony, TT successfully calls into question the veracity of eSpeed's most important testimonial evidence.

In addition to challenging Glista's testimony itself, TT elicits contradictory testimony from eSpeed witnesses regarding the inclusion of the Trade Pad module in the various versions of GL Win. For example, Spada testified that all versions of GL Win, beginning with version 4.20, contained the Trade Pad application (GL exh. L, at 29), and Varjacques stated that the "functionality of Trade Pad was included in all the functions in all versions of Trade Pad since the 4.31 and later on" (eSpeed exh. 14, at 32). In response, TT presented testimony from a number of GL customers during the 1998 to 1999 time frame, who stated that they had neither heard of Trade Pad nor seen any GL product with a vertical static price axis. TT garnered such testimony from employees of Merrill Lynch (TT, exh. K, at ¶ 3), HSBC (TT exh. L, at ¶¶ 3-4), Transmarket (TT exh. M, at 295-96) TT exh. O, at 187), DE Trading (TT exh. P, at ¶ 4), Saratoga (TT exh. Q, at 51-52, 60), and Marquette Partners (TT Exh. R, at 135-36), some of whom were customers identified by GL as having received Trade Pad. (*See* TT exh. LLL, at 229, 434; TT exh. UU, at 439; TT exh. CC, at 35, 22).[9] TT also points to testimony of Nick Garrow, a sales and marketing department employee at the MATIF Exchange, who remembered training on GL Win, and yet did not remember any window like that described

_____

[9] TT focused specifically on Elliot Lapan, a former employee of Transmarket, who was identified by GL, Varjacques, and Josephine Sheng as having publicly used Trade Pad in 1999 (*see* TT exh. CC, at 35; UU at 439; YYYY, at 118). Lapan, however, testified that he had never seen the module called GL Trade Pad prior to his deposition in this case (TT, exh. M, at 178), and never received training on a GL order entry interface containing a vertical price ladder (*id.*, at 296).

as Trade Pad. Garrow gave demonstrations of GL Win to prospective new members of the

Exchange, lasting anywhere from ten minutes to two hours (TT exh GGGG, at 30). And

although Garrow never traded on the Exchange himself, only received initial training from

GL, and could not swear that he went through every single module with every single trader,

every single time (*id.*, at 35, 37, 39), he explained:

> I think the only way I can answer that question is to say given the amount of
> time we spent on the product, I spent on the product I would be surprised
> sitting here today if I had overlooked substantial numbers of modules that were
> staring me in the face every single day which I did not bother opening up or
> doing anything about. So I cannot say a degree of possibility, a probability
> what that translates back to, but I think we were pretty familiar with the
> products to be honest with you, to the best of my recollection.

(*Id.*, at 40-41).

In responding to TT's rebuttal witnesses, Spada entered an affidavit explaining that

version 4.11 customers, CME customers, "dual access" traders, and some users of version 4.50

would not have had versions of GL Win that included the Trade Pad module for various

reasons (TT exh. 79, at ¶¶ 5, 12, 7; TT exh. 84, at 77). Because TT's rebuttal witnesses did not

state which version of GL Win they were using, eSpeed argues that there can be no ensuing

implication from their lack of knowledge about the Trade Pad module. Additionally, and

more persuasively, eSpeed reminds us that TT's rebuttal witnesses had no relationship with

CIS or GL, and therefore no personal knowledge of the GL-CIS contract. Like the alleged

offer of sale of Trade Pad to CME discussed in a footnote above, the relevancy of TT's rebuttal

witnesses is precarious. While it might shed some light on whether GL Win included Trade

Pad during the relevant time period, it does not carry substantial weight.

TT argues that once Glista's and Spada's testimony falls down under the pressure of

impeachment, eSpeed is left with no leg on which to stand. Although defendants point to

corroborating testimony of additional CIS employees that Trade Pad was included in the CIS

contract, TT contends that such testimony is insufficient. Specifically, TT notes that Malo testified that he was not familiar with the Trade Pad screen prior to meeting with GL's attorneys in 2007 (TT exh. DDD, at 29), Mastro did not testify that he knew of the module prior to the critical date, and Cartier testified that he could not say he recalled seeing Trade Pad prior to receiving the manual from Wattiez (TT exh. FF, at 66). Mastro's testimony that he demonstrated the Trade Pad module is irrelevant, TT contends, as such demonstrations occurred after the critical date (eSpeed exh. 54, at 55-56).

Even if Glista's testimony was solid, TT subjects defendants' documentary evidence – user guides and manuals and source code – to heavy scrutiny and relevance challenges. Pointing to several typos and errors, along with multiple versions of the same manuals, TT suggests that the manuals and user guides were internal drafts unlikely to have been distributed. Further, TT contends that the illustrations of Trade Pad shown in the guides differ from the oral testimony and do not describe a static ladder. Although the screen shots included in the manuals do show vertical price ladders, without a description of a static price ladder or a description of how to recenter the inside market, TT asserts that the manuals cannot corroborate a vertical static price ladder. With respect to the source code, TT challenges its validity, noting that the Morgane server was never produced, and therefore the code has not been authenticated. Further, plaintiff contends that the existence of source code, and even the delivery of the source code to the integration and testing team, does not establish offer for sale, sale, or delivery of the actual technology to customers.

Defendants suggest the TT's challenge to the authenticity of its manuals and user guides must fail, submitting testimony from Wattiez that she distributed the manuals after she trained people on GL Win and Trade Pad in the relevant time period (see GL exh. G, at 76-77). GL counsel explains:

[T]his time period was highly pressured for GL because many of the exchanges were either preparing to go electronic or were increasing their electronic exchange. GL was directly involved in the launch of the LIFFE CONNECT for Futures in the U.K., Globex2 at the CME, as well as the MATIF and MONEP. Thus, as is quite common when working under tight delivery deadlines, it is likely that there will be oversights and typographical errors in documents when there is limited time to review and perfect them.

(GL reply, at 54).

In summing up all if its arguments, TT argues that eSpeed is left with nothing, uncorroborated oral testimony that has been decimated by impeachment, unauthenticated documentary evidence and a number of GL customers averring that they never saw Trade Pad during the relevant time period. Therefore, TT asserts, and we agree, that eSpeed has not carried its burden to establish the necessary undisputed facts to prove by clear and convincing evidence that GL sold or offered to sell its GL Win with Trade Pad to CIS in the February 17, 1999, contract. Our decision turns primarily on eSpeed's failure to sufficiently corroborate the testimony of Mike Glista. Without Glista's testimony, defendants cannot prove as a matter of law that Trade Pad was included in GL Win at the time of the GL-CIS contract. While eSpeed may be able to prove during trial that the sale included Trade Pad, it is up to a finder of fact to decipher contradicting testimony, implications of bias, authenticity of documentary evidence, and credibility. Nor do we find TT's evidence so compelling to grant summary judgment on its behalf. Taking the facts in the light most favorable to defendants, as we must in assessing plaintiff's summary judgment motion, there are disputed issues of material fact remaining for the fact-finder.

We must address one final point. Defendants refer us to the portion of the contract stating that the license included the "Software Modules and Extra Services subscribed by the Client on the attached Schedules" (eSpeed exh. 59, at G106265). "Extra Services" is defined by the contract to mean "the service provided by the Supplier for the maintenance, upgrade

and support of the Software Modules under the Addendum I hereto" (*id.*, at G106264). Therefore, in several places in its myriad briefs, eSpeed contends, with respect to the added market depth feature of version 4.51, that CIS also contracted for GL Win enhancements that occurred during the 18-month contract period (*see, e.g.*, eSpeed brief '304, at 13-14). Although eSpeed's argument regarding enhancements is generally relegated to the market depth argument, we want to make clear that it would not cover Trade Pad as a module, even if Trade Pad was later offered as an enhancement. <u>Pfaff</u> requires that the invalidating product must be the subject of a commercial offer for sale. 525 U.S. at 67. Defendants fail to prove as a matter of law that Trade Pad was the subject of a commercial offer for sale.

Without sufficient proof to elicit a finding of the sale, we need not address the remaining questions of whether Trade Pad contained the elements of the patents-in-suit or whether Trade Pad was ready for patenting.

<u>CONCLUSION</u>

For the reasons stated herein, we deny eSpeed's motions for summary judgment that TT's patents are invalid based on GL Win with Trade Pad prior art, and TT's cross-motion that Trade Pad was not sold or offered for sale.

JAMES B. MORAN
Senior Judge, U. S. District Court

_____, 2007.