## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Trading Technologies International, Inc., )
                                                     )

               Plaintiff, )            Case No. 04 C 5312

                                                       )

                 v. )            Judge James B. Moran

                                                       )

eSpeed, Inc., eSpeed International, Ltd., )      Magistrate Sidney I. Schenkier
Ecco LLC, and EccoWare, Ltd., )

                                                       )

            Defendants. )
_____ )

## eSPEED'S COMBINED BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW THAT THE ASSERTED CLAIMS ARE INVALID BASED ON ANTICIPATION, OBVIOUSNESS, PRIOR SALE, HAVE A JUNE 9, 2000 PRIORITY DATE, AND ARE NOT INFRINGED

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................. 1

I. THE ASSERTED CLAIMS ARE INVALID AS OBVIOUS OR ANTICIPATED ........... 1

  A. The Asserted Claims Are Obvious as a Matter of Law ................................... 1

    1. The Scope and Content of the Prior Art......................................................... 3

      *a. TT admitted that all elements were in the prior art* ...................................... 3

      *b. TIFFE and TSE are prior art*................................................................... 6

      *c. The Midas Kapiti system is prior art*....................................................... 10

      *d. GL Win 4.31 with Trade pad is prior art*.................................................. 12

    2. The Level of Ordinary Skill in the Art......................................................... 16

    3. The Differences Between the Prior Art and the Claimed Invention Are Obvious ..... 16

      *a. Claim 1 of the '304 patent is obvious as a matter of law*............................... 17

      *b. The dependent claims of the '304 patent are obvious as a matter of law* ..................... 20

      *c. Claim 1 and Claim 14 of the '132 patent are obvious as a matter of law* ..................... 21

      *d. The dependent claims of the '132 patent are obvious as a matter of law* ..................... 22

    4. The Secondary Considerations Do Not And Cannot Overcome The Strong
       Prima Facie Obviousness ......................................................................... 24

  B. Many Claims of the '132 and '304 Patent Are Anticipated by the Prior Art................ 27

    1. Trade Pad, TSE, TIFFE and Midas Kapiti Meet the "Single Action" Element
       With the Court's Claim Construction........................................................... 28

    2. Trade Pad Anticipates With the Real Construction of "Single Action"...................... 30

    3. Midas Kapiti Anticipates With the Real Construction of "Single Action" ................. 31

    4. TSE and TIFFE Anticipate Under the Real Construction of "Single Action" ........... 31

II. THE CORRECT PRIORITY DATE IS JUNE 9, 2000 BECAUSE THE "SINGLE
    ACTION" CLAIM TERM WAS NOT DESCRIBED UNTIL THEN........................ 32

  A. The Narrow "Single Click" Does Not Support The Broader "Single Action".............. 32

   B. eSpeed Proved That the Correct Priority Date Is June 9, 2000 ..................................... 34

   C. TT Did Not Counter eSpeed's Evidence, Instead Arguing About Irrelevant
      Issues That Do Not Affect The Priority Date ................................... 36

    1. Written Description Is Not Claim Construction, And The Provisional
       Application Did Not Describe Nor Disclose Single Action ............................ 37

    2. Even If Single Click Supports Double Click, And It Does Not, Single
       Click Still Cannot Support Single Action ....................... 39

    3. Express Disclaimer Is Not Required To Show Inadequate Written Description........ 41

III. TT'S PRIOR SALE OF THE INVENTION TO BRUMFIELD INVALIDATES
     THE ASSERTED PATENTS........................................................ 42

   A. The Facts Proving The Prior Sale Were Not Disputed.................................. 43

   B. TT's Sale of Market Depth Trader Software More Than One Year Before
      Filing For A Patent Invalidates the Patents In Suit........................ 46

    1. The On Sale Bar Requires Only The Sale of An Invention Ready for Patenting ....... 47

    2. TT's Sale of Market Depth Trader to Brumfield Invalidates The Patents ................ 48

    3. That Brumfield, The Buyer, Is A Named Co-Inventor On The Asserted
       Patents Does Not Alter TT's Commercial Exploitation ................................. 50

IV. eSPEED DID NOT INFRINGE AND IS NOT LIABLE FOR INFRINGEMENT......... 51

   A. TT Has Not Proven Direct Infringement Under 35 U.S.C. § 271(a) ............................. 52

    1. No Evidence Supports Finding Direct Infringement of Method Claims ..................... 53

    2. No Evidence Supports Finding Direct Infringement of Client System Claims........... 54

   B. TT Has Not Proven eSpeed Is Liable For Indirect Infringement.................................. 56

    1. TT Presented No Evidence of Direct Infringement by Customers .............................. 56

    2. There is No Evidence Of Contributory Infringement ..................................... 58

    3. There Was No Evidence That eSpeed Had Specific Intent to Induce Others
       to Infringe TT's Patents ................................................. 61

CONCLUSION ................................................................ 66

# TABLE OF AUTHORITIES

**CASES**

*ACCO Brands, Inc. v. ABA Locks Manufacturers Co., Ltd.*, 501 F.3d 1307 (2007) .........57

*AdvanceMe Inc. v. RapidPay, LLC*, 2007 WL 2350644 (2007) ........................................18

*Allen Engineering* at 1352 .................................................................................................50

*Augustine Medical, Inc. v. Gaymar Industrial, Inc.*, 181 F.3d 1291 (1999)................. 38-9

*BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (2007).......................52, 58, 61

*BMC Resources*, 2007 WL 2728400 ............................................................................ 55-6

*Brasseler v. Stryker Sales Corp.*, 182 F.3d 888 (1999) ....................................................47

*Cardiac Science, Inc. v. Koninklijke Philips Electrics*, 466 F.Supp.2d 1150....................42

*Cargill*, 476 F.3d at 1368...................................................................................................14

*In re Carlson*, 983 F.2d 1032.............................................................................................8

*Chester v. Miller*, 906 F.2d 1574 (1990) ..........................................................................36

*Crane Co. v. Goodyear Tire & Rubber Co.*, 577 F.Supp. 186 (1983)...............................11

*Cross Medical Products v. Medtronic Sofamor Danek*, 424 F.3d 1293 (2005) ...............58

*DSU Medical Corp. v. JMS Co., Ltd*, 471 F.3d 1293 (2006).......................................58, 62

*E-Pass Technologies, Inc. v. 3Com Corp.*, 473 F.3d 1213 (2007) ...................................64

*Eolas Technologies Inc. v. Microsoft Corp.*, 399 F.3d 1325 (2005) ................................16

*Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357 (2006) ....................................................33

*Finnsugar Bioproducts, Inc. v. Amalgamated Sugar Co.*, 2001 WL 303683 (2001) ........48

*Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565 (1983) ........................................53

*Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473 (1998)........................................42

*Genzyme Corp. v. Atrium Medical Corp.*, 315 F.Supp.2d 552 (2004) ............................30

*Graham v. John Deere Co.*, 383 U.S. 1(1966) .................................................................1

*In re Curtis*, 354 F.3d 1347 (2004) ................................................................36

*In re Hall*, 781 F.2d at 897 (1986) ...................................................................8

*In re Howarth*, 654 F.2d 103 (1981) .................................................................8

*In re Klopfenstein*, 380 F.3d 1345 (2004) .................................................8, 10

*In re MacLean*, 454 F.2d 756 (1972) ..............................................................36

*Jarrard v. CDI Telecommunications, Inc.*, 408 F.3d 905 (2005) ......................30

*Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770 (1993) ............................................53

*KSR International Co. v. Teleflex, Inc.*, 127 S.Ct. 1727 (2007) ...................1-3, 17-9, 25-7

*Key Pharms. v. Hercon Laboratoriess Corp.*, 161 F.3d 709 (1998)...................30

*L-3 Comms. Security v. Am. Sci. & Engineering*, No. Civ.A. 04-10339-RWZ,
2005 WL 2323179 (2005)..................................................................................49

*Lockwood v. American Airlines, Inc.*, 107 F.3d 1565 (1997) ...........................41

*McMullin v. Carrol*, 2004 WL 2342562 (Bd. Pat. App & Int. Sept. 2004), *aff'd*,
153 Fed. Appx. 738 (2005)......................................................................36, 39, 42

*Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544 (1990) ...................62, 65

*Martin v. Mayer*, 823 F.2d 500 (1987) ........................................................40-1

*MercExchange, LLC v. eBay, Inc.*, 401 F.3d 1323 (Fed. Cir. 2005), *vacated on
other grounds*, 126 S.Ct. 1837 ......................................................................63-4

*Minton v. NASD*, 226 F.Supp.2d 845 (2002) ...................................................49

*Muniaction, Inc. v. Thompson, Corp.*, 2007-14S5 (2007) ................................56

*New Railhead Manufacturing, L.L.C. v. Vermeer Manufacturing Co.*, 298 F.3d
1290 (2002)...................................................................................................36, 41

*New Hampshire v. Maine*, 532 U.S. 742 (2001).........................................30, 56

*O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576 (1997)..............................................42

*OKI America, Inc. v. Advanced Micro Devices, Inc.*, 2006 WL 2711555 (2006).............12

*Pfaff v. Wells*, 525 U.S. 55 (1998) .......................................................................13-5, 47-9

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342 (2007)............................5

*RF Delaware, Inc. v. Pacific Keystone Technologies, Inc.*, 326 F.3d 1255 (2003)...........53

*Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559 (1997)............36

*Reno v. ACLU*, 521 U.S. 844 (1997)..................................................................................9

*Riverwood Intern. Corp. v. Mead Corp.*, 212 F.3d 1365 (2000) .......................................26

*Robotic Vision Systems, Inc. v. View Engineering, Inc.*, 249 F.3d 1307 (2001)...............15

*SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278 (2005)....................................30

*Sjolund v. Musland*, 847 F.2d 1573 (1988)........................................................................6

*Special Devices, Inc. v. OEA, Inc.*, 270 F.3d 1353 (2001) .......................................47-8, 50

*Tronzo v. Biomet, Inc.*, 156 F.3d 1154 (1998) ............................................................40, 42

*Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 7 U.S.P.Q.2d 1097
    (1998)............................................................................................................................62

*Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1325 ........................................ 15, 48-50

*In re Wyer*, 655 F.2d 221 (1981).........................................................................................9

*Zacharin v. United States*, 213 F.3d 1366 .......................................................................49

## OTHER AUTHORITIES

35 U.S.C. § 102(b) ........................................................................... 8, 10-1, 16, 47

35 U.S.C. § 103(a) ........................................................................................1, 9

35 U.S.C. § 112 ...........................................................................................35

35 U.S.C. § 271(a) ......................................................................................52

35 U.S.C. § 271(b) ......................................................................................62

35 U.S.C. § 271(C) ......................................................................................58

## INTRODUCTION

eSpeed, Inc., eSpeed International, Ltd., Ecco LLC, and EccoWare, Ltd., (collectively "eSpeed"), pursuant to Federal Rule 50, hereby move for judgment as a matter of law on several issues, on the schedule as directed by the Court: (1) invalidity by obviousness and anticipation; (2) the correct priority date is June 9, 2000; (3) invalidity by prior sale; and (4) eSpeed does not infringe the asserted claims. These four issues are addressed separately in the four sections below. Based on the evidence presented at trial, no reasonable jury could find in favor of TT on these issues, and any such finding does not have support in and is against the weight of the relevant evidence offered at trial.

## I. THE ASSERTED CLAIMS ARE INVALID AS OBVIOUS OR ANTICIPATED

### A. The Asserted Claims Are Obvious as a Matter of Law

A claimed invention is unpatentable under 35 U.S.C. § 103(a) "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter would have been obvious at the time the invention was made to one of ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). The obviousness of a patent is a *legal* conclusion based on the underlying factual inquiries: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations of non-obviousness such as long-felt need, commercial success and copying. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

Recently, the Supreme Court ruled on the obviousness of combination patents in a way that is totally binding and dispositive in this case. *See KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727, 1734 (2007). Prior to *KSR*, Federal Circuit law had required that, in order for a patent claming a combination of old elements to be obvious under § 103, there had to be evidence of a

"teaching, suggestion, or motivation" in the prior art for a skilled artisan to make a combination of prior art references. In *KSR*, the Supreme Court rejected this test. A unanimous Supreme Court held that "[t]he combination of familiar elements according to known methods is *likely to be obvious when it does no more than yield **predictable** results.*" *Id.* at 1739 (emphasis added).

The Court explained that "[w]hen a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, *§ 103 likely bars its patentability.*" *Id.* at 1740 (emphasis added). "For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, *using the technique is obvious unless its actual application is beyond his or her skill.*" *Id.* (emphasis added). In this context, the Court stated that "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense." *Id.* at 1742.

*KSR* held that the obviousness inquiry is not limited to only the prior art directed to the exact subject matter of the patents; rather, "any need or problem known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* Thus, a court may look beyond the elements of the prior art designed only to solve the same problem, and it may assume that a person of ordinary skill in the art will be able to fit the teachings of multiple patents or inventions together. *Id.*

*KSR* strikes a fatal blow to TT's patents. The evidence at trial was undisputed that all of the elements of TT's patents were present in the prior art; the art in question was predictable; and it would not have been beyond the skill of an ordinary artisan to make the claimed combination.

In particular, it was undisputed at trial that the only difference between the independent claims and the prior art was the addition of single action order entry to the claims.[1] Further, the evidence was undisputed at trial that single action order entry was not merely *known* to persons of skill in the art, but rather, as TT admitted, "single-actions have been *everywhere* since 1990." (Ex. 1, 10/04/07 PM Trans. at 54-55 (TT Closing)). TT also admitted that the additional limitations recited in the dependent claims were known to person of ordinary skill in the art. TT did not dispute that the addition of single action order entry (or any of the other limitations recited in the dependent claims) to a static price axis was technically within the ordinary skill in the art, and presented nothing to dispute that this combination was predictable. Under these circumstances, no reasonable jury applying the standards set forth by the Supreme Court could have found the combination of a static price axis with single action order entry to be non-obvious.

## 1. The Scope and Content of the Prior Art

As a matter of law, the prior art in this case consists of functionality and features admitted by TT to exist in the prior art; particular references undisputed by TT to exist in the prior art (including the TSE and TIFFE references); and the Trade Pad and Midas Kapiti art. Based on the evidence and TT's admissions, no reasonable jury could have concluded otherwise.

### a. *TT admitted that all elements were in the prior art*

---

[1] Although TT argued that the claimed order entry region limitation was distinct from certain prior art, the addition of single action to any of the prior art with a static price axis would have eliminated this distinction as well.

During trial, TT specifically admitted that all of the limitations of the independent and dependent claims were present in the prior art. In closing arguments, TT's counsel stated:

> It's important to note here that notwithstanding what the defendants have been trying to suggest to you, *no one from TT is suggesting that Mr. Brumfield and the other co-inventors invented any one of these individual elements standing alone. That is not the invention*. The invention is, as Judge Moran will instruct you, the *combination* of all of these elements in Claim 1, then adding on single-action cancellation, display of working orders, and the other dependent claims. It's that *combination of ingredients* that is the invention in this case.

(Ex. 2, 10/04/07 AM Trans. at 10-11 (TT Closing); *see also* Ex. 1, 10/04/07 PM Trans. at 25, 49 (TT Closing) (acknowledging "*our combination patent*")).

With respect to the main limitation of the claims, "static" prices, during closing, TT's counsel specifically admitted that static prices were in the prior art, and contended that they were before the PTO: "The Patent Office knew there were static prices." (Ex. 1, 10/04/07 PM Trans. at 52-53). TT also presented two different witnesses that contended static prices were in the prior art. Its patent law expert testified that a static display of prices was before the PTO in the Buist '282 Patent. (Ex. 3 10/2/07 PM Trans. at 25-26 (Nixon)). Likewise, TT elicited testimony from its obviousness expert Christopher Thomas that a static display of prices was in the prior art. (Ex. 3 10/2/07 PM Trans. at 111-12 (Thomas)). Thomas testified to this again on cross examination. (Ex. 4, 10/03/07 AM Trans. at 63) ("Q. So let's try to figure out if the elements of TT's patents that were in the claims actually existed in the prior art. We talked about static. Static existed in the prior art, correct? A. In the alleged prior art, yes.").

With respect to single action, the evidence was overwhelming and undisputed that single action order entry was a commonplace feature in the prior art. Harris Brumfield, TT's CEO and principal inventor, admitted that single action was in the prior art. (Ex. 5, 9/19/07 PM Trans. at 42-43 (Brumfield)). eSpeed put on extensive testimony that single action was widespread not

only in prior art trading systems, but in the art of graphical user interface design as a whole. (*E.g.*, Ex. 6, 9/27/07 PM Trans. at 72-74, 110-111 (Dezmelyk); Ex. 7, 9/26/07 PM Trans. at 41, 94-99 (Silverman)). TT never contended otherwise, and its experts even agreed. (Ex. 4, 10/3/07 AM Trans. at 63 (Thomas) (Q. And single action order entry existed in the prior art, correct? A. That's correct.")). To remove any conceivable dispute about this, in closing arguments, TT's counsel told the jury "let's not forget, single-actions *have been everywhere since 1990*," which was almost a decade before TT's alleged priority date. (Ex. 1, 10/04/07 Closing PM Trans. at 54-55).

TT's expert Chris Thomas specifically admitted that other elements of the asserted independent and dependent claims were known in the art:

> Q. The display of market depth, that existed in the prior art?
> A. Yes, it did.
> Q. The vertical layout of prices with the adjacent bids and asks, that existed in the prior art, correct?
> A. Yes.
> Q. And displaying bids and asks in different colors, that existed in the prior art, correct?
> A. Yeah.
>
> ***
>
> Q. And we'll talk about that. But the display of working orders existed in the prior art, correct?
> A. That's correct.
> Q. And in fact, the display of working orders was in virtually all of the electronic trading systems in the prior art, correct?
> A. Yes.

(Ex. 4, 10/3/07 AM Trans. at 63-64 (Thomas)). Such deliberate and unequivocal judicial admissions establish that all of the components of the alleged invention were present in the prior art, as a matter of law. *See e.g., PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007) ("Admissions in the specification regarding the prior art are binding on the

patentee for purposes of a later inquiry into obviousness."); *Sjolund v. Musland,* 847 F.2d 1573, 1577-79 (Fed. Cir. 1988) (where admissions were made about prior art, "the jury was not free to disregard [that matter]" and "must have accepted [it] as prior art, as a matter of law").

### b.  *TIFFE and TSE are prior art*

The verdict form required the jury to consider whether eSpeed proved by clear and convincing evidence that TSE, TIFFE, Midas Kapiti, and Trade Pad were prior art. This was error. During closing arguments, *TT acknowledged that the TSE and TIFFE were prior art.* Given the parties' agreement, and the lack of any evidence to the contrary, the jury could not reasonably have concluded differently.

> According to TT's counsel's closing statements:
>
> They want to ignore that real world evidence, and instead, they want you to focus on *four things that have a static price axis -- and they do, we never disputed that.* But what they don't have, these four things, is single-action order entry; they don't have working orders in alignment; they don't have single-action cancellation; *and two of them, Midas Kapiti and Trade Pad, aren't even prior art.*

(Ex. 1, 10/04/07 PM Trans. at 52). TT's attorney was referring to prior art references that eSpeed had presented at trial – the TSE, TIFFE, Trade Pad, and Midas Kapiti references – and only disputed that two of these references were prior art. At no other time during trial did TT present evidence or argument that the TIFFE and TSE references were not prior art. TT's concession, and the failure of TT to dispute this fact through any evidence or argument, means that no reasonable jury could have concluded that TSE and TIFFE were not constitute prior art.

In fact, clear, convincing, and totally unchallenged evidence was submitted during trial that the TSE *was* prior art. eSpeed presented evidence that in August 1998, the TSE prepared a user manual to describe the way that the new trading terminals would operate. (Ex. 8, 9/26/07 AM Trans., at 72-73; Ex. 9, DTX 179; Ex. 10, DTX 2101). Atsushi Kawashima, a TSE

6

employee, was personally responsible for preparing that manual, and his deposition was read to the jury. (Ex. 8, 9/26/07 AM Trans., at 72-73). Kawashima testified that in August of 1998, the user manual was given to the "participants" in the TSE – that is, "securities companies for banks who are able to carry out futures/options trading at the TSE." (*Id.* at 74). According to Kawashima, two copies were "given to *all* the participants able to conduct futures/options trading. That would be about 200 companies." (*Id.* at 74-75) (emphasis added). There were no restrictions on what the participants could do with the 1998 manual after they received it. (*Id.* at 74-75).

In November 1998, the TSE system launched. (*Id.* at 83-84). More than 100 users received the TSE system. (*Id.*). To obtain the system, participants applied to the TSE for a certain number of terminals that they needed to install, and the TSE installed the terminals based on those needs. (*Id.* at 84). Apart from the physical restriction that the terminals were located in the brokers' offices, the TSE did not place any restrictions on who could see the trading screens. (*Id.* at 84-85). Hiroyuki Kida, a software developer for a Japanese software company named Midas Kapiti, visited brokers' offices in 1998 for the purpose of installing other trading software. He testified by video deposition that he saw dozens of TSE screens on display in each of the three brokers' offices he visited by November 1998, including their static display of prices and rapid order entry. (Ex. 11, 10/1/07 AM Trans., at 19-20). During the course of his work he entered up to a hundred orders using the TSE terminals. (*Id.* at 21). He was not informed that the TSE terminals were confidential. (*Id.* at 19-21).

TT provided no evidence to the contrary, and did not dispute that the TSE or TIFFE manuals were prior art. No reasonable jury could have concluded otherwise. In particular, no

reasonable jury could have reached the conclusion that the TIFFE and TSE user manuals, and the TSE screens themselves, were not "printed publication" prior art under 35 U.S.C. § 102(b).

Section 102(b) of the patent code provides that "a person shall be entitled to a patent unless the invention was patented or *described in a printed publication in this or a foreign country* or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b) (emphasis added). The statute clearly indicates that there is no geographic limitation on "printed publication" prior art. *See In re Carlson*, 983 F.2d 1032, 1038 (Fed. Cir. 1992) (quoting *In re Howarth*, 654 F.2d 103, 106 (C.C.P.A. 1981)).

"The statutory phrase 'printed publication' has been interpreted to mean that before the critical date the reference must have been sufficiently accessible to the public interested in the art; dissemination and public accessibility are the keys to the legal determination whether a prior art reference was 'published.'" *In re Klopfenstein*, 380 F.3d 1345, 1348 (Fed. Cir. 2004). "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication" bar under 35 U.S.C. § 102(b).' *In re Hall*, 781 F.2d at 897, 898-99 (Fed. Cir. 1986). Factors involved in assessing whether a displayed reference is a "printed publication" include "the length of time the display was exhibited, the expertise of the target audience, the existence (or lack thereof) of reasonable expectations that the material displayed would not be copied, and the simplicity or ease with which the material displayed could have been copied." *Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004).

Kawashima and Kida's undisputed testimony establish that the TSE user manual – which was disseminated to essentially the entire electronic trading community in Japan – was prior art.

Likewise, the TSE terminal screens themselves were prior art. A computer screen is no less a printed publication than the same image displayed on a piece of paper. The Supreme Court has recognized that information provided digitally through the internet is "published" material. *See Reno v. ACLU*, 521 U.S. 844, 853 (1997). Likewise, the PTO's Manual of Patent Examining Procedure states that "[a]n electronic publication, including an on-line database or Internet publication, is considered to be a 'printed publication' within the meaning of 35 U.S.C. § 102(a) and (b) provided the publication was accessible to persons concerned with the art to which the document relates." MPEP, ¶ 2128; *see also In re Wyer*, 655 F.2d 221, 226 (C.C.P.A. 1981) ("The traditional process of 'printing' is no longer the only process synonymous with 'publication.' The emphasis, therefore, should be public dissemination of the document, and its availability to persons skilled in the subject matter or art.").

Here, Kawashima's testimony established that the TSE computer terminals displaying a static price axis, dynamic bids and asks, and rapid order entry were disseminated to at least 100 different users by November 1998. (Ex. 8, 9/26/07 AM Trans. at 72-75). The TSE terminal displays were delivered to the same entities that received the 1998 TSE user manuals, (*Id.* at 74, 83-84), with even wider distribution because the brokers received *numerous* different terminals. For example, by November 1998 Kida saw as many as 50 different terminal displays at the offices of UBS, and about 20 at BNP Paribas. (Ex. 11, 10/1/07 AM Trans. at 19-20). Neither the display nor the order entry was confidential. (Ex. 11, 10/1/07 AM Trans. at 14-17). The publicly available display was accessible to the entire Tokyo investment community and visible to anyone who walked into a broker's trading desk, or anyone else who wanted to purchase the terminals for a fee payable to the TSE. This evidence is easily sufficient to establish the display of the TSE trading screens on the terminals as printed publications under 35 U.S.C. § 102(b), as

corroborated by the TSE user manual. *See Klopfenstein*, 380 F.3d at 1347, 1350-52. Here, the terminal images were available for viewing by persons of ordinary skill in the art such as Kida for *months* before the earliest claimed priority date of the TT patents.

TT never disputed that the TSE manual or system (or the TIFFE system) was a prior art printed publication, or submitted any argument or evidence to the contrary. In light of this uncontradicted evidence, no reasonable jury could find that the TSE was not in the prior art.

### c. *The Midas Kapiti system is prior art*

Likewise, no reasonable jury could find that the Midas Kapiti system is not prior art. In 1998, Midas Kapiti, a Japanese software vendor, developed a new window for its Market Trader front end product called "Fast Order Entry," which was used to enter orders on Japanese Exchanges. (Ex. 12, 9/28/07 PM Trans. at 116-17). As TT admitted during closings, the Fast Order Entry module displayed a static ladder of prices. (Ex. 1, 10/4/07 PM Trans. at 52). It also had rapid order entry that could be performed in one or two clicks. (Ex. 12, 9/28/07 PM Trans. at 122-25). This functionality was described in a user manual that was published in March 1998 – two years before TT filed its provisional application. (Ex. 12, 9/28/07 PM Trans. at 10-13; Ex. 13, DTX 618 at 10-14). Hiroyuki Kida, a software installer for Midas Kapiti, testified that the user manual was disseminated and made available to five or six users at Paribas in 1998, and that Midas Kapiti never placed any restriction on what the users could do with the user manual. (Ex. 11, 10/01/07 AM Trans. at 10-13). The manual was an accurate reflection of software that existed at that time. (*Id.* at 12-13).

The initial version of Fast Order Entry did not allow for the display of the best bid and ask quantities, because the Tokyo Stock Exchange did not make that information available to ISVs. (Ex. 11, 10/01/07 AM Trans. at 14). Once the TSE made that information available to

ISVs, in March 1999 Midas Kapiti updated the Fast Order Entry window to display this best bid and best ask size information. On March 18, 1999, Midas Kapiti delivered written release notes describing the functionality of the system to its clients. According to Kida, the release notes were delivered and made available to approximately 80 users. (Ex. 12, 9/28/07 PM Trans. at 117-19; Ex. 14, DTX 617). There was no restriction on how the users could use the release notes. (Ex. 12, 9/28/07 PM Trans. at 119-20).

The Midas Kapiti user manual and the release notes, and the screens themselves, are prior art for the same reasons that the TSE and TIFFE user manuals are prior art. Courts have held that "[d]istribution of a limited number of copies of a printed document to an interested segment of the public is sufficient to constitute a publication barring a patent pursuant to 35 U.S.C. § 102(b)." *Crane Co. v. Goodyear Tire & Rubber Co.*, 577 F. Supp. 186, 197 (D.C. Ohio 1983). That is the case here. Midas Kapiti provided the description of Fast Order Entry to customers, without restrictions on what they could do with it. That is sufficient to be a printed publication, because the disclosure was given to an interested segment of the public. In *Crane*, for example, the court held that a distribution of documents to three airframe manufacturers was a publication under § 102(b), even though some of the material was marked "restricted" or "confidential." *Id.* The court reasoned that such markings of confidential were of "no consequence where plaintiff intended to and actually did distribute the documents to its major commercial customers who comprised the interested population in the United States." *Id.*

Kida also testified that there was no restriction on the screens themselves, which were delivered along with the release notes to the end users. He testified that Market Trader with Fast Order Entry was delivered to approximately 80 users at UBS by March 18, 1999, all of their computers were capable of displaying the Fast Order Entry screen, and that the displayed image

on the screen was not confidential or secret. (Ex. 11, 10/1/07 AM Trans. at 15-16). As noted, the display of an image on a computer screen is no less a printed publication than the same image on a piece of paper, particularly in this case where it could be seen and copied by anyone who saw the monitors in a trading room. (*Id.*).

TT contended that despite this testimony, the numerous release notes describing Fast Order Entry are not prior art because Kida stated later in his deposition that Midas Kapiti did not want other software vendors to see the screens or documents. (Br. at 4). That is not relevant. Whether Midas Kapiti distributed the documents to its competitors (or wanted them distributed to competitors) is legally irrelevant, where they were delivered to customers without any restrictions. Further, there was uncontradicted evidence that confidentiality restrictions on user guides are routinely disregarded in the trading software industry, including by TT itself. (Ex. 6, 9/27/07 PM Trans. at 21-28). *See OKI America, Inc. v. Advanced Micro Devices, Inc.*, 2006 WL 2711555, at *5 (N.D. Cal., Sep. 21, 2006) (holding that "even where portions of a report are labeled confidential, if the recipients are allowed to share the contents of a report with others, the report is considered 'accessible,' and therefore a printed publication."). Accordingly, no reasonable jury could have found that the Midas Kapiti release notes and trading screens do not constitute "printed publications."

### d. GL Win 4.31 with Trade Pad is prior art

Finally no reasonable jury could have concluded that the GL Win 4.31 with Trade Pad was not prior art. The uncontradicted testimony at trial, corroborated by the source code and overwhelming documentary evidence, demonstrated that the GL Win 4.31 with Trade Pad was offered for sale to the CME and Cargill more than one year before the alleged March 2, 2000

priority date, and was in public use in the United States more than one year before the alleged March 2, 2000 priority date.

No reasonable jury could conclude that Trade Pad was not offered for sale more than one year before the earliest alleged priority date, March 2, 2000. The United States Supreme Court in *Pfaff v. Wells Electronics* set forth a two-part test to trigger the on-sale bar: (1) the claimed invention is the subject of a commercial sale or offer for sale, and (2) the invention is "ready for patenting." 525 U.S. 55, 67 (1998).

The clear and uncontradicted evidence shows that the Trade Pad was implemented into GL Win 4.31 in December 1998, then slightly modified, and then again implemented into GL Win 4.31 in January 1999 without further modifications. (Ex. 15, DTX 3052; Ex. 16, DTX 570; Ex. 17, 9/20/07 AM Trans. at 45-52 (Jollant); Ex. 18, 9/21/07 AM Trans. at 31-38 (Havard); Ex. 19, 9/25/07 PM Trans. at 81-82 (Webster)). In December 1998, and again in January 1999, GL Win 4.31 with Trade Pad was delivered to the CME in Chicago as part of GL's ongoing requirements to provide the CME with software updates pursuant to their contract. (Ex. 20, DTX 520; Ex. 21, DTX 519 ; Ex. 22, DTX 518; Ex. 17, 9/20/07 AM Trans. at 56-57 (Jollant); Ex. 23, 9/28/07 AM Trans. at 79, 81-82 (Varjacques); Ex. 24, 9/24/07 AM Trans. at 33-39 (Spada); Ex. 18, 9/21/07 AM Trans. at 38-39 (Havard)). The CME evaluated the software in January 1999, and determined that it did not fit the needs of its customers. (Ex. 20, DTX 520; Ex. 17, 9/20/07 AM Trans. at 57-58 (Jollant); Ex. 24, 9/24/07 AM Trans. at 42-43, 46 (Spada)).

In February 1999, GL Trade contracted with Cargill (in Chicago) for the lease of GL Win software. (Ex. 25, DTX 524; Ex. 19, 9/25/07 PM Trans. at 41-42 (Mastro testimony); Ex. 23, 9/28/07 AM Trans. at 82-83 (Varjacques)). The contract covered the GL Win software at that time with all of its modules, including Trade Pad, for the United States and Europe. (Ex. 25,

DTX 524; Ex. 19, 9/25/07 PM Trans. at 44-47, 53 (Mastro); Ex. 23, 9/28/07 AM Trans. at 82-83 (Varjacques)). Trade Pad was a standard module of GL Win. (Ex. 17, 9/20/07 AM Trans. at 27-29 (Jollant); Ex. 12, 9/28/07 PM Trans. at 94-95 (Wattiez)). The back up source code shows that Trade Pad was present in the GL Win 4.31 source code by the time of the contract. (*E.g.*, Ex. 18, 9/21/07 AM Trans. at 31-33 (Havard); Ex. 17, 9/20/07 AM Trans. at 29-35, 39-41 (Jollant); Ex. 6, 9/27/07 PM Trans. at 69-70 (Webster)). Witnesses from Cargill confirmed that Cargill reviewed the GL Win software, and in particular, Trade Pad, before the contract was signed. (Ex. 19, 9/25/07 PM Trans. at 50-51 (Mastro); Ex. 26, 9/24/07 PM Trans. at 70, 78-80). GL Trade provided a copy of the GL Win 4.31 software, including Trade Pad to Cargill (among other customers) in February 1999. (Ex. 27, DTX 522; Ex. 28, DTX 579; 9/24/07 AM Trans. at 49-56 (Spada)). After the contract was entered, GL Trade provided Cargill with a user manual that discussed the Trade Pad module, and further, trained Cargill's employees on the use of Trade Pad. (Ex. 29, DTX 592; Ex. 30, DTX 719; Ex. 12, 9/28/07 PM Trans. at 94-102 (Wattiez)). This uncontradicted evidence, corroborated by numerous documents, is clear, convincing, and demonstrates beyond any dispute that Trade Pad existed and was the subject of a commercial offer for sale.[2]

The "ready for patenting" prong for both Trade Pad versions also is satisfied as a matter of law. An invention can be shown to be "ready for patenting" in at least two ways: (1) by proof of reduction to practice before the critical date; and (2) by proof that prior to the critical date, the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention. *Pfaff*, 525 U.S. at 67-68; *Cargill*, 476 F.3d at 1368. "A process is reduced to practice when it is successfully performed"

---

[2] This documentary evidence contrasts starkly with the documentary evidence of TT's alleged invention presented at trial, which consisted of a single handwritten document.

and "a machine is reduced to practice when it is assembled, adjusted and used." *Pfaff*, 525 U.S at 57 n.2 (*quoting Corona Tire Co. v. Dovan Chem. Corp.*, 276 U.S. 358, 383 (1928).

However, proof of reduction to practice is not necessary to obtain a patent, and likewise is not necessary to a showing of § 102(b) invalidity. *See Pfaff*, 525 U.S. at 61, 66. An invention is ready for patenting if, prior to the critical date, the inventor had prepared a description of the invention sufficiently detailed to enable one skilled in the art to practice the invention. *Id.* at 67-68. Drawings have been accepted by courts, including the United States Supreme Court, in numerous cases as satisfying the "ready for patenting" requirement. *See, e.g.*, *Pfaff*, 525 U.S. at 68; *Weatherchem*, 163 F.3d at 1333; *Robotic Vision Systems, Inc. v. View Engineering, Inc.* 249 F.3d 1307, 1311-12 (Fed. Cir. 2001).

GL Win 4.31 with Trade Pad was reduced to practice no later than December 1998. The back-up source code for GL Win v. 4.31 with Trade Pad demonstrates that it was working for its intended purpose by no later than December 8, 1998. (*E.g.*, Ex. 18, 9/21/07 AM Trans. at 31-33 (Havard); Ex. 17, 9/20/07 AM Trans. at 29-35, 39-41 (Jollant); Ex. 19, 9/25/07 PM Trans. at 76-79, 81-86 (Webster)). Mike Glista placed live orders into the market with this version of Trade Pad prior to Cargill entering into the February 17, 1999 contract. (Ex. 26, 9/24/07 PM Trans. at 79 (Glista); (Ex. 19, 9/25/07 PM Trans. at 50-51 (Mastro)). This version was shown to the CME in January 1999. (Ex. 20, DTX 520; Ex. 21, DTX 519 ; Ex. 22, DTX 518; Ex. 17, 9/20/07 AM Trans. at 56-57 (Jollant); Ex. 24, 9/24/07 AM Trans. at 33-39 (Spada); Ex. 18, 9/21/07 AM Trans. at 38-39 (Havard)). And, GL installed this product with several customers, including Cargill, on February 6, 1999 for their use on the MATIF exchange. (Ex. 27, DTX 522; Ex. 28, DTX 579; Ex. 24, 9/24/07 AM Trans. at 49-56 (Spada)).

Further, February 1999 manuals show and describe the GL Win v. 4.31 with Trade Pad, and a February specification details improvements to the Trade Pad's functionality, further demonstrating that it was reduced to practice at the time of the CIS contract. (Ex. 31, DTX 722; Ex. 32, DTX 573; Ex. 17; 9/20/07 AM Trans. at 74-82 (Jollant)). In light of this uncontradicted evidence presented at trial, GL Win v. 4.31 with Trade Pad was "ready for patenting" at the time the CIS contract was signed, and thus, constitutes prior art.

Furthermore, no reasonable jury could have found that the GL Win 4.31 with Trade Pad was not in prior use in the United States before March 2, 1999. The Federal Circuit has held that the demonstration of software to a third party without obligations of confidentiality constitutes a public use of the software under 35 U.S.C. § 102(b). *Eolas Technologies Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1334 (Fed. Cir. 2005). There was uncontradicted evidence that GL Trade demonstrated its Trade Pad software to CME and to Cargill without obligations of confidentiality before the March 2, 1999 critical date. (Ex. 26, 9/24/07 PM Trans. at 94 (Glista); Ex. 23, 9/28/07 AM Trans. at 98 (Varjacques); (Ex. 20, DTX 520; Ex. 21, DTX 519 ; Ex. 22, DTX 518; Ex. 24, 9/24/07 AM Trans. at 33-39 (Spada)). Accordingly, no reasonable jury could have found that the GL Win 4.31 with Trade Pad was not in the prior art.

### 2. The Level of Ordinary Skill in the Art

The parties did not dispute that person of ordinary skill in the art was a college educated individual with at least two years of experience in computer programming. Likewise, the parties did not dispute that it was within the skill in the art to program a graphical user interface design, including the combination of single action with static prices, as claimed in the patents. (Ex. 1, 10/04/07 PM Trans. at 51 (TT Closing)).

### 3. The Differences Between the Prior Art and the Claimed Invention Are Obvious

Under *KSR*, the differences between the claims and the prior art – to the extent that any exist at all – are so insignificant as to be obvious as a matter of law. TT has admitted that all of the elements of its claims are in the prior art, that the art in question is predictable, and that a person of skill in the art would have known how to make the alleged combination. This is dispositive under KSR.

### a.    *Claim 1 of the '304 Patent is obvious as a matter of law*

To the extent there is any, the only alleged difference between the prior art (including the admitted prior art such as the TSE) and claim 1 of the '304 patent is the claim's requirement of a single action to send the trade order to the exchange.[3] (*See* Ex. 6, 9/27/07 PM Trans. at 109-10 (Dezmelyk); Ex. 1, 10/04/07 PM Trans. at 52 (Closing). In terms of functionality, the only alleged difference between the TSE and TIFFE systems and the claimed invention was the difference between a double click (as admittedly within the claims) and a double click, a keystroke to enter a quantity, and pressing the enter button (as called for by the TSE and TIFFE systems). (Ex. 4, 10/3/07 AM Trans. at 82/83 (Thomas); Ex. 6, 9/27/07 PM Trans. at 98-100, 106-110 (Dezmelyk); Ex. 7, 9/26/07 PM Trans. at 91-92 (Silverman); Ex. 33 9/27/07 AM Trans. at 21-26 (Silverman); Ex. 34, DTX 1226). The only alleged difference between the GL Win 4.31 with Trade Pad and the claimed invention was the difference between a right click / left click to enter an order and a double left click. (*E.g.*, Ex. 36, 10/02/07 AM Trans. at 14-15 (Pirrong)). The only alleged difference between the Midas Kapiti system and claim 1 of the patent was that Midas Kapiti required two clicks separated by mouse movement. (DTX 618; Ex. 35, 10/02/07 AM Trans. at 30-31 (Pirrong)). eSpeed disputes that these trivial variances are differences at all

---

[3] TT's expert Thomas tried to make this difference seem more significant by stating that the TSE also did not have an "order entry region" as that claim was defined by the Court. But the addition of single action order entry would have eliminated that distinction as well.

under the claim construction that the Court adopted based on TT's own claim construction arguments. However, even assuming that they were, the differences are obvious as a matter of law.

Modifying the order entry of TSE, TIFFE, Midas Kapiti, and Trade Pad to be a double left click (or other single action) was perfectly obvious. KSR states that that "[t]he combination of familiar elements according to known methods is *likely to be obvious when it does no more than yield **predictable** results*." *KSR*, 127 S. Ct. at 1739. Post-*KSR* case law has confirmed that combinations of prior art references that work as expected render patent claims invalid, along with modifications of prior art references to suit new problems and technological developments. *See, e.g., AdvanceMe Inc. v. RapidPay, LLC*, 2007 WL 2350644, at * 1 (E.D. Tex. Aug 14, 2007) (patent was invalid as obvious where inventor "built on long-established prior art, packaged the idea in a new way, and marketed it aggressively.").

Here, TT admitted that single action was "everywhere" by 1990, and the undisputed evidence presented at trial establishes that single action order entry was used in a wide variety of trading screens, and in other graphical user interfaces, in order to achieve advantages of speed. (Ex. 6, 9/27/07 PM Trans. at 65-74 (Dezmelyk); (Ex. 7, 9/26/07 PM Trans. at 94-99 (Silverman)). TT never disputed this. Likewise, it was entirely undisputed that the addition of single action to a static price axis would yield predictable results. TT itself went out of its way to establish that the art of user input devices and graphical user interfaces was predictable through the testimony of Dr. Craig Pirrong, and even relied on eSpeed's expert Robert Dezmelyk to prove this point. (Ex. 36, 10/1/07 PM Trans. at 95-97 (Pirrong relying on Dezmelyk)). Nor did TT ever attempt to dispute or contradict Dezmelyk's testimony that the addition of single action to the TSE or any other system would have yielded predictable results. (Ex. 6, 9/27/07 PM

Trans. at 104-05, 110-11 (Dezmelyk)). There was no dispute between the parties that the addition of the admittedly widespread "single action" to a static price axis in any of the prior art systems would have yielded the absolutely predictable result of a static price axis with single action order entry – precisely what is claimed in the patent. No reasonable jury could have held that this miniscule difference between the claims and the prior art was nonobvious under the standards set forth in *KSR*.

*KSR* also states that "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, *using the technique is obvious unless its actual application is beyond his or her skill*." *Id.* at 1740 (emphasis added). Again, the evidence was uncontradicted that single action had been used to improve the order entry of trading systems dating back to the early 1990s and before. According to TT, single action was "everywhere" by this time. eSpeed presented expert testimony that given its widespread nature, the addition of single action order entry to a static price axis system would not be beyond the skill of a person of ordinary skill in the art. (Ex. 6, 9/27/07 PM Trans. at 110-11 (Dezmelyk)). TT never disputed this; and in fact, *specifically admitted* that this was the case during closing arguments:

> Then the other thing that they were fond of doing in their testimony is that they took the patent, TT's own patent, and used it as a road map to argue that, *Well, once I know what the invention is, I would know how to build it. Well, that is right, that is right.*

(Ex. 1, 10/04/07 PM Trans. at 51 (Closing)). Furthermore, TT never disputed or presented *any evidence* to contradict the testimony of eSpeed's experts that a person of skill in the art would have been motivated to combine single action order entry with a static price axis to achieve advantages of speed. (Ex. 6, 9/27/07 PM Trans. at 111-12 (Dezmelyk); Ex. 33, 9/27/07 AM Trans. at 25 (Silverman)). Nor could it; TT's own patent specification points out the

predominant importance of speed to a trader. (Ex. 37, DTX 1 at 1:45-65). Thus, by any measure, the alleged difference between claim 1 and the prior art would have been obvious, and no reasonable jury could have concluded otherwise based on the evidence submitted at trial.

### b. The dependent claims of the '304 patent are obvious as a matter of law

The remaining asserted claims of the '304 patent were either admittedly obvious variations, or were indisputably disclosed in the prior art. Accordingly, no reasonable jury could have found that these claims were nonobvious.

Asserted claim 14 adds the additional limitation of a bid and ask order entry region aligned with the static display of prices. (Ex. 38, DTX 2 at claim 14). The evidence at trial demonstrated that this is an undisputed characteristic of each of the TSE, TIFFE, Midas Kapiti, and Trade Pad prior art references. (*E.g.*, Ex. 10, DTX 2101; Ex. 34, DTX 1226; Ex. 7, 9/26/07 PM Trans. at 110-13 (Silverman); Ex. 6, 9/27/07 PM Trans. at 136 (Dezmelyk)). Accordingly, no reasonable jury could have found this claim nonobvious.

Asserted claim 15 relies on claim 14 and adds the additional limitation that the bid and ask order entry regions overlap with the bid and ask display regions. The evidence at trial demonstrated that this is an undisputed characteristic of the TSE, TIFFE, and Trade Pad systems, and would require only a trivial, predictable modification of the Midas Kapiti. (*E.g.*, Ex. 7, 9/26/07 PM Trans. at 111-12 (Silverman); Ex. 6, 9/27/07 PM Trans. at 136-37 (Dezmelyk)). Accordingly, no reasonable jury could have found this claim nonobvious.

Asserted claim 26 relates to recentering the display of the best bid and ask indicators. This is an undisputed characteristic of the TSE, TIFFE, Midas Kapiti and Trade Pad references. (*E.g.*, Ex. 7, 9/26/07 PM Trans. at 113-14 (Silverman); Ex. 6, 9/27/07 PM Trans. at 138 (Dezmelyk)). Accordingly, no reasonable jury could have found this claim nonobvious.

Asserted claim 11 relates to the display of third and fourth indicators – additional bids and asks in the market, *i.e.*, market depth. This is an undisputed characteristic of the TSE and TIFFE systems. (*E.g.*, Ex. 9, DTX 179; Ex. 34, DTX 1226; Ex. 7, 9/26/07 PM Trans. at 115 (Silverman); Ex. 6, 9/27/07 PM Trans. at 137-38 (Dezmelyk)). Moreover, TT's own expert admitted that the addition of market depth to a trading system would have been obvious. (Ex. 4, 10/3/07 AM Trans. at 77-78 (Thomas)). Accordingly, no reasonable jury could have found this claim nonobvious.

### c. Claim 1 and Claim 14 of the '132 patent are obvious as a matter of law

The two independent claims of the '132 patent are obvious as a matter of law for the same reason as claim 1 of the '304 patent. (Ex. 6, 9/27/07 PM Trans. at 106-14 (Dezmelyk)). The only alleged difference between the TSE and TIFFE art and these claims was the difference between a double click (as called for by TT's trial claim construction position) and a double click, a keystroke to enter a quantity, and pressing the enter button (as per the TSE and TIFFE systems). The only alleged differences between the GL Win 4.31 with Trade Pad and the claimed invention were (1) the difference between a right click / left click to enter and order and a double left click, and (2) the display of market depth. The only alleged differences between the Midas Kapiti system and claim 1 of the patent were that (1) Midas Kapiti required two clicks separated by mouse movement; and (2) display of market depth. As noted above, TT's own expert Thomas testified that the display of market depth in a trading system was obvious. (Ex. 4, 10/3/07 AM Trans. at 77-78 (Thomas)). Accordingly, the analysis is the same for claims 1 and 14 of the '132 patent as it is for claim 1 of the '304 patent. Thus claims 1 and 14 of the '132 patent are invalid as a matter of law for the same reasons.

### d. The dependent claims of the '132 patent are obvious as a matter of law

The remaining asserted claims of the '304 patent were either admittedly obvious variations, or were indisputably disclosed in the prior art. No reasonable jury could have found that these claims were nonobvious.

Claims 2 and 15 recite the additional limitations that the single action in the buy order entry region sends a buy order, and a single action in the sell order entry region sends a sell order. The undisputed evidence at trial showed that these additional limitations are expressly disclosed in the TSE, TIFFE, and Trade Pad prior art references. (*E.g.*, Ex. 7, 9/26/07 PM Trans. at 123 (Silverman); Ex. 6, 9/27/07 PM Trans. at 115-16 (Dezmelyk)). Accordingly, no reasonable jury could have found this additional limitation nonobvious.

Claims 20 and 40 recite the additional limitation that the display of the bids and asks be in a vertical orientation. The undisputed evidence at trial showed that these additional limitations are expressly disclosed in the TSE, TIFFE, and Trade Pad prior art references. (*E.g.*, Ex. 7, 9/26/07 PM Trans. at 123-24 (Silverman) Ex. 6, 9/27/07 PM Trans. at 117-18 (Dezmelyk)). Accordingly, no reasonable jury could have found this additional limitation nonobvious.

Claim 24 recites the additional limitation requiring the recentering of the bids and asks. The undisputed evidence at trial showed that this addition limitation is expressly disclosed in the TSE, TIFFE, and Trade Pad prior art references. (*E.g.*, Ex. 7, 9/26/07 PM Trans. at 111-12 (Silverman); Ex. 6, 9/27/07 PM Trans. at 118-19 (Dezmelyk)). Accordingly, no reasonable jury could have found this additional limitation nonobvious.

Claims 27 and 47 recite the additional limitation requiring that the static prices be displayed in at least one direction in numerical order. The undisputed evidence at trial showed

that this limitation is expressly disclosed in the TSE, TIFFE, and Trade Pad prior art references. (Ex. 9, DTX 179, Ex. 10, DTX 2101; Ex. 7 9/26/07 PM Trans. at 124 (Silverman); Ex. 6, 9/27/07 PM Trans. at 119-20 (Dezmelyk)). Accordingly, no reasonable jury could have found this additional limitation nonobvious.

Claims 28 and 48 recite the additional limitation requiring that the static prices be displayed in a single line in numerical order. The undisputed evidence at trial showed that this limitation is expressly disclosed in the Midas Kapiti, TSE, TIFFE and Trade Pad prior art references. (Ex. 9, DTX 179; Ex. 10, DTX 2101; Ex. 7, 9/26/07 PM Trans. at 124 (Silverman); Ex. 6, 9/27/07 PM Trans. at 120-21 (Dezmelyk)). Accordingly, no reasonable jury could have found this additional limitation nonobvious.

Claims 50 and 52 recite the additional limitation that the bid order entry region and the bid display region overlap, and that ask order entry region and the ask display region overlap. The undisputed evidence at trial showed that this limitation is expressly disclosed in the TSE, TIFFE, and Trade Pad references. (Ex. 9, DTX 179; Ex. 10, DTX 2101; Ex. 7, 9/26/07 PM Trans. at 111-13, 125 (Silverman); Ex. 6, 9/27/07 PM Trans. at 121-22 (Dezmelyk)). Accordingly, no reasonable jury could have found this additional limitation nonobvious.

Claims 25 and 45 recite the additional limitation of dynamically displaying working orders in alignment with the prices corresponding thereto. TT's own expert testified that the display of working orders was in "virtually all of the electronic trading systems in the prior art." (Ex. 4, 10/3/07 AM Trans. at 63-64 (Thomas)). The Trade Pad prior art display expressly contained such a feature as construed by the court. (Ex. 7, 9/26/07 PM Trans. at 128-30 (Silverman); Ex. 33, 9/27/07 AM Trans. at 11-13, 18 (Silverman)). And, the record evidence was undisputed that displaying an additional column for working orders aligned with the static

prices was predictable, within the skill in the art, and would not have led to unexpected results. (Ex. 9, DTX 179; Ex. 10, DTX 2101; Ex. 33, 9/27/07 AM Trans. at 18-20 (Silverman); Ex. 6, 9/27/07 PM Trans. at 120-21, 129-33 (Dezmelyk)). Accordingly, no reasonable jury could have found this limitation nonobvious.

Claim 7 recites the additional limitation of cancelling an order with a single action of the user input device. As discussed earlier with respect to the independent claims, the evidence was overwhelming that "single action" was everywhere in the prior art as of 1990. Moreover, the record evidence is undisputed that the prior art disclosed numerous examples of cancelling orders with a single action. (Ex. 7, 9/26/07 PM Trans. at 41, 125-26 (Silverman); Ex. 6, 9/27/07 PM Trans. at 110-11, 126-29 (Dezmelyk). This feature was a predictable variation, within the skill in the art, and would not have led to unexpected results. (Ex. 6, 9/27/07 PM Trans. at 104-05, 129 (Dezmelyk)). Accordingly, no reasonable jury could have found this limitation nonobvious.

Claim 23 recites the additional limitation of displaying the bids and asks in different colors. The record evidence at trial established that the display of information in different colors is a totally basic element of graphical user interface design, present in numerous prior art trading systems. (Ex. 9, DTX 179; E x. 10, DTX 2101; Ex. 7, 9/26/07 PM Trans. at 41, 126-28 (Silverman); Ex. 6, 9/27/07 PM Trans. at 122-25 (Dezmelyk); Ex. 4, 10/3/07 AM Trans. at 64 (Thomas)). This feature was a predictable variation, within the skill in the art, and would not have led to unexpected results. Accordingly, no reasonable jury could have found this limitation nonobvious.

### 4. Secondary Considerations Do Not And Cannot Overcome the Strong Prima Facie Obviousness

24

The purported evidence of secondary considerations that TT presented at trial cannot overcome the clear showing of nonobviousness. First, *KSR* states that "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, *using the technique **is obvious** unless its actual application is beyond his or her skill*." 127 S. Ct. at 1740. The Supreme Court's standard, by its own clear language, does not permit the use of secondary considerations to rebut obviousness where such a showing has been made; the claim is simply obvious. That is the case here, as discussed above. Single action order entry was known in the prior art, was known to improve the speed of trading, and known to improve the speed of interaction with a graphical user interface generally. (Ex. 6, 9/27/07 PM Trans. at 66, 68-70, 72-74, 110-12 (Dezmelyk)). There was no dispute that using the same technique to improve a static ladder display was well within the skill in the art. (Ex. 6, 9/27/07 PM Trans. at 110-14 (Dezmelyk)). Under these circumstances, no amount of secondary considerations can save TT's patent claims, and they are invalid as a matter of law. *KSR*, 127 S. Ct. at 1740.

TT's arguments for secondary considerations fail for other legal reasons. Although TT posited the existence of a number of secondary considerations – including commercial success, industry acceptance and praise, and copying – TT failed to meet its burden of demonstrating *any* nexus between the alleged secondary consideration the claim language. TT argued that MD Trader, the purported commercial embodiment of the patent claims, was a "commercial success." But MD Trader was never marketed independently; rather, only as a "small" part of an overall software package (X Trader). There was no evidence that MD Trader itself was a commercial success, or that any success of X Trader was due to any claimed features (much less the specific combination of old elements recited in the asserted claims). In fact, the record evidence

demonstrates that TT required substantial marketing efforts and expenditures in order to sell MD Trader. Moreover, the Trade Pad evidence demonstrates that the patent claims cannot be linked to any commercial success. Trade Pad was essentially identical to the asserted patent claims (differing, allegedly, only by the use of the right mouse button rather than the left in a sequence of two clicks), but Trade Pad was undisputedly *not* a commercial success. This evidence indicates that any alleged, unproven success X Trader may have enjoyed was due to reasons other than the combination recited in the claims.

Likewise, although TT alleged that eSpeed copied TT, it failed to produce a shred of evidence that eSpeed copied the allegedly novel combination of prior art elements represented by TT's patent claims. Absent such evidence, TT's alleged "copying" evidence has no probative value and cannot weigh against a finding of obviousness. *E.g. Riverwood Intern. Corp. v. Mead Corp.*, 212 F.3d 1365, 1367 (Fed. Cir. 2000).

With respect to industry acceptance, the licensing of TT's patent does not demonstrate its validity, nor can it overcome the strong showing of obviousness as a matter of law. The record evidence presented at trial demonstrated that the licensees of the '132 and '304 patents settled with TT to avoid the costs of unwanted litigation. The record evidence of industry praise amounts to nothing more than the hearsay declarations of individuals hand-picked by TT's counsel, who were unfamiliar with the prior art. This type of evidence, which is of questionable competence, taken as true is not sufficient to override the clear showing of obviousness based on the prior art, even if they should have been allowed as evidence and *KSR* did not forbid such a showing under these circumstances. Furthermore, as further described in eSpeed's motion for a new trial also filed contemporaneously today, the secondary considerations presented by TT at trial were not adequate as a matter of law because they did not relate to the claimed features

(such as commercial success or licensing) and were not presented from the point of view of one of ordinary skill in the art (such as skepticism and praise).

In fact, there was overwhelming evidence of secondary considerations presented at trial that TT's patent claims *were* obvious. For example, even if the Midas Kapiti and Trade Pad references were not technically prior art under § 102, they are strong objective indicia that the person of ordinary skill in the art would created the same or substantially the same trading system as claimed in the patent – at or before the date of TT's alleged invention. As discussed above, Midas Kapiti's Fast Order Entry and Trade Pad differ from the claimed invention – if at all – only in very trivial ways. That two other software vendors (indeed, four others if one counts the undisputed TSE and TIFFE prior art) developed virtually the exact same combination before TT is exceptionally strong evidence that points toward a finding of obviousness.

When the issue of obviousness is considered in light of the appropriate standards set forth by the Supreme Court in *KSR*, no reasonable jury could have reached a conclusion of nonobviousness with respect to any of the claims.

**B.     Many Claims of the '132 and '304 Patent are Anticipated by the Prior Art**

Finally, separate and apart from the issue of obviousness, many claims of the '304 patent and '132 patent are anticipated as a matter of law by the GL Win 4.31 with Trade Pad, Midas Kapiti, TSE and TIFFE prior art references. According to TT, the only alleged difference between the prior art and many asserted claims was the addition of "single action." But this is no difference at all. The Court's claim construction of single action – which was urged by TT during the *Markman* proceedings – clearly encompassed right/left action (TradePad); it encompassed a single click (Midas Kapiti); and it encompassed a double-click / keystroke / <enter> (TSE and TIFFE). Under the Court's actual construction, the prior art anticipates these

claims, and TT should not have been permitted to argue otherwise under the doctrine of judicial estoppel.

### 1. Trade Pad, TSE, TIFFE and Midas Kapiti Meet the "Single Action" Element With the Court's Claim Construction

During the *Markman* proceedings, the parties offered various competing definitions of the critical claim term "single action of the user input device." CQG, for example, offered a construction that would have limited the term to a single click or a double click of a user input device. (*Markman* Op. at 16; Ex. 39, 8/17/06 *Markman* Tr. at 322). eSpeed offered a construction that would have limited the term to require a single computer command to select an area in the order entry region. (*Markman* Op. at 15). TT, however, disparaged both constructions and urged this Court to adopt a far broader definition.

During the *Markman* hearing, TT's counsel specifically rejected the notion that "single action" could be limited to a single click or double click: "We believe that CQG's construction *improperly limits a single user action to a single click or a double click only.*" (*Markman* Tr., at 70:10-12). In its briefing, TT asserted: "CGQ's proposed construction is overly narrow in that it limits the term to meaning just a single or double click of a user input device – examples of the preferred embodiment. The patent specification does not require such a narrow construction. . . . [T]here are a *host of other actions that can qualify as single actions.*" (TT Markman Reply, at 36) (emphasis added).

In accordance with the position it took during the preliminary injunction hearing, TT urged that a "single action of a user input device" means "an action by a user within a short period of time that may comprise one or more clicks of a mouse button or other input device." (*E.g.*, Ex. 40, 8/18/06 Markman Tr. at 538; TT's Post Preliminary Injunction Hearing Op. Br. at 12, 22-23, 25-26; TT Markman Br. at 30-31). The Court adopted TT's position at the

preliminary injunction phase, and again adopted TT's position in its October 31, 2006, *Markman* ruling. (Markman Op. at 15-16). In so doing, the Court also specifically rejected CQG's assertion that the claim term is limited to a single or double click: "Defendant CQG advocates limiting the construction of "single action" to a 'single click or a double click of a user input device' .... We reject [this] construction[]." (*Id.* at 16).

The Court's construction encompasses the Trade Pad order entry functionality as a matter of law. A right-click / left-click is an action by the user; it comprises one or more clicks of a mouse; and it can be done in a short period of time. Indeed, this Court can take judicial notice that a human being can tap a middle finger and index finger (right/left on the mouse) more quickly in succession than tapping the index finger twice (double-click of the mouse). There is no rational basis to assert that the former action is not a single action, while the latter (admittedly) is. Certainly there is nothing in the Court's claim construction, which encompasses any action by the user in a short period of time that may comprise one or more clicks of a mouse button, that excludes the Trade Pad order entry.

The Court's construction also encompasses the Midas Kapiti order entry. The testimony at trial showed that the system allowed Midas Kapiti to enter an order with a single click of the mouse after the quantity parameter is set – exactly like TT's product and the patent claims (Ex. 12, 9/28/07 PM Trans. at 122-25 (Kida)). Although TT's expert mischaracterized the order entry as requiring two clicks separated by movement of the mouse, that functionality is also contained within the literal language of the Court's claim construction of single action.

The Court's construction also encompasses both the TSE and TIFFE systems as a matter of law. The order entry of these systems merely required a double click, followed by pressing two keyboard buttons (one to select a quantity, and then the <enter> button to complete the

transaction). There is nothing in the Court's claim construction that excludes this type of order entry (it is one or more clicks of the mouse or other input device in a short period of time), and it therefore meets the single action limitation as a matter of law.

TT should never have been permitted to content otherwise. "It is well established that the doctrine of judicial estoppel acts to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Jarrard v. CDI Telecommunications, Inc.*, 408 F.3d 905, 914-15 (7th Cir. 2005) (internal quotations and citations omitted). "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1291 (Fed. Cir. 2005).

Here, after convincing the Court to adopt its position on "single action," TT blatantly reversed course and adopted CQG's proposed claim construction that it (and the Court) previously rejected. This about-face was foreclosed as a matter of law. Having succeeded on its position regarding the proper meaning of "single action." TT was judicially estopped from contending that otherwise during trial. *See e.g., Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 712-16 (Fed. Cir. 1998) (rejecting party's flip-flop on claim construction positions; change in position was "an obvious attempt to salvage its invalidity case" justifying estoppel); *see also Genzyme Corp. v. Atrium Medical Corp.*, 315 F. Supp. 2d 552, 578 (D. Del. 2004) ("This court cannot countenance allowing a party to defend one point of view at trial, and argue another after receiving an adverse verdict.").

    **2.**      **Trade Pad Anticipates With the Real Construction of "Single Action"**

Under the proper claim construction of "single action," no reasonable jury could conclude that Trade Pad does not anticipate claim 1, 14, 15, and 26 of the '304 patent. The single action limitation was the only alleged difference between the Trade Pad and these claims. As noted earlier, Trade Pad indisputably has a bid order entry region and ask order entry region aligned with the static prices (claim 14); this overlaps with the bid and ask display region (claim 15); and Trade Pad allows for manual recentering (claim 26). Based on the evidence presented at trial, no reasonable juror could conclude that GL Win 4.31 with Trade Pad did not anticipate these claims.

### 3. Midas Kapiti Anticipates With the Real Construction of "Single Action"

Under the proper claim construction of "single action," no reasonable jury could conclude that Midas Kapiti does not anticipate claim 1, 14, and 26 of the '304 patent. The single action limitation was the only alleged difference between Midas Kapiti and these claims. As noted earlier, Midas Kapiti indisputably has a bid order entry region and ask order entry region aligned with the static prices (claim 14); and allows for manual recentering (claim 26). Based on the evidence presented at trial, no reasonable juror could conclude that Midas Kapiti did not anticipate these claims.

### 4. TSE and TIFFE Anticipate Under the Real Construction of "Single Action"

Under the proper claim construction of "single action," no reasonable jury could conclude that TSE and TIFFE do not anticipate claims 1, 11, 14, 15, 26 of the '304 patent (all asserted claims). The single action limitation was the only alleged difference between these claims and TSE/TIFFE. As noted above, TSE and TIFFE both have a bid order entry region aligned with the static prices (claim 14); this overlaps with the bid and ask display region (claim 15); they allow for manual recentering (claim 26); and have market depth (claim 11).

31

Under the proper claim construction of "single action," no reasonable jury could conclude that TSE and TIFFE do not anticipate claims 1, 14, 2, 15, 20, 40, 24, 27, 47, 28, 48, 50, 52, and 7 of the '132 patent. Again, the single action limitation was the only alleged difference between these claims and the TSE and TIFFE references. As noted above, TSE and TIFFE both have bid and ask order entry regions aligned with the static prices (claims 2 and 15), a vertical price axis (claims 20 and 40), they have manual recentering (claim 24), they display the prices in numerical order (claims 27 and 47), in a single (claims 28 and 48); and have overlapping bid/ask display and bid/ask order entry regions (claims 50 and 52). Finally, under the proper construction of single action, the TSE has single action cancellation, which is performed in essentially the same manner as the order entry, and therefore anticipates claim 7. (Ex. 6, 9/27/07 PM Trans. at 127-28 (Dezmelyk)).

## II. THE CORRECT PRIORITY DATE IS JUNE 9, 2000 BECAUSE THE "SINGLE ACTION" CLAIM TERM WAS NOT DESCRIBED UNTIL THEN

The asserted patents are entitled to the priority date of June 9, 2000. The non-provisional patent application filed on that date is the first time the applicants used and provided support for the "single action" claim term. Defendants incorporate by reference the several briefs and oral arguments which have been submitted on this issue, including motions for summary judgment, oppositions to TT's motions for summary judgment, and oppositions to motions *in limine* regarding the priority date issue (and witnesses' ability to testify about the priority date). In addition, Defendants state as follows in support of their motion for judgment as a matter of law.

### A. The Narrow "Single Click" Does Not Support The Broader "Single Action"

It is not disputed that the asserted claims all include the "single action" claim limitation. It is not disputed that the March 2, 2000 provisional application disclosed only the phrase "single click" and not the phrase "single action." (Ex. 41, provisional application.) And it is not

disputed that "single action" is a much broader term than "single click," expressly intended to capture more than just a single click. The non-provisional application itself reports that a single click is "an example of a single action of the user." (Ex. 42, non-provisional application.)

The disputed issue, therefore, had been whether or not the "single click" disclosed in the March 2, 2000 provisional application supported the broader "single action" disclosed first in the June 9, 2000 non-provisional application. The answer, clear on the face of the applications and confirmed by the evidence at trial, is that single click does *not* support single action. It was not until the June 9, 2000 non-provisional application that the scope of the specification was broadened to include "any action by a user within a short period of time, whether comprising one or more clicks of a mouse button or other input device." (Ex. 42, non-provisional application.) In the non-provisional, TT exercised its prerogative to "act as its own lexicographer" with respect to the claim term "single action of a user input device." TT did not suggest that the term generally carried such a broad connotation among artisans in field; indeed, if persons of ordinary skill generally so understood it, there would have been no need to define the term as they did in the specification. *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1365 (Fed. Cir. 2006) ("A patent need not teach, and preferably omits, what is well known in the art."). Rather, TT stipulated in the non-provisional that any action or actions fitting this broad definition would be "*considered* a single action of the user *for the purposes of the present invention.*"

There is nothing wrong or improper with having broadened the disclosure in this way between March and June 2000, but the change means that TT is stuck with the June 9, 2000 filing date as its priority date. Of course TT insisted at trial that the additional concepts introduced in the June 2000 application meant nothing and should be ignored, but they cannot be ignored, and the jury's verdict cannot stand.

The documentary evidence, even without any expert testimony, is sufficient to show on its face that TT broadened the scope of its claims and is entitled to the June 9, 2000 priority date. The expert testimony presented at trial, particularly the expert testimony of Mr. Richard Ferraro, only bolsters the conclusion that the March 2, 2000 provisional application exclusively disclosed the use of a single click, preached great importance in using a single click and not other embodiments, and did not teach the use of multiple clicks nor the use of different non-mouse input devices. In response, TT's expert Dr. Pirrong merely addressed three "straw man" arguments set up by TT's counsel so that Dr. Pirrong could knock them down. As discussed below, however, the arguments were irrelevant as a matter of law.

**B.      eSpeed Proved That The Correct Priority Date Is June 9, 2000**

At trial, eSpeed relied on the provisional application, non-provisional application, evidence by co-inventor Mr. Brumfield, and expert testimony by Mr. Ferraro, among other evidence, to show that the correct priority date for the asserted patents is June 9, 2000. The provisional application used the term "single click" over a hundred times. (Ex. 43, Ferraro 9/25 AM, at 62.) The provisional application always referred only to the single click of a mouse. (*Id.* at 61-62.) The provisional application repeatedly referred to the single click feature as an innovation. (*Id.* at 53-59.) The provisional application described the importance of speed associated solely with the single click feature. (*Id.* at 50-52.) The provisional application never mentioned anything other than a single click of a mouse button to enter an order. (*Id.* at 59.)

The non-provisional, in contrast, disclosed and defined a "single action." (*Id.* at 69-70.) As described in the non-provisional, and as construed by the Court, a "single action" did not really have to be one action, was not limited to a single click, and was not even limited to a mouse input device. (*Id.* at 46-47; Ex. 42, non-provisional application). Therefore, only upon

34

reading the non-provisional application would anyone have been put on notice that the inventors possessed anything other than a single click.

At trial, Mr. Brumfield confirmed the importance he had given to the single click functionality. In his own words, the problem that he set out to solve with the invention was on the scale of nano-seconds: "Occasionally I was concerned that that nano second that I clicked it would flip out from underneath me." (Ex. 44, Brumfield 9/17 PM, at 52.) Mr. Brumfield further testified that the single click solution "goes back to the core, speed, speed, speed, of everything I try to do." (*Id*.) Against this backdrop, and consistent with the March 2, 2000 provisional application, no concept other than a single click even entered the mind of the co-inventors.

Mr. Ferraro, an expert reviewing these and related documents, confirmed that one of ordinary skill in the art would not find any disclosure of anything other than a single click in the March 2, 2000 provisional application. (Ex. 43, Ferraro 9/25 AM, at 63.) In fact, as of that provisional application date, he testified that "it would be loud and clear that the inventor specifically desired that system to be implemented with a single click of a mouse button." (*Id*. at 59-60.) Mr. Ferraro further confirmed that the concept of anything other than a single click was not disclosed until the later June 9, 2000 non-provisional application. (*Id*. at 69-70.)

As a necessary legal conclusion from these facts, judgment as a matter of law should be granted because the March 2, 2000 provisional application did not provide sufficient disclosure for the "single action" term first found in the June 9, 2000 non-provisional application. The Federal Circuit has held:

> the specification of the *provisional* must "contain a written description of the invention and the manner and process of making and using it, in such full, clear, concise, and exact terms," 35 U.S.C. § 112 ¶ 1, to enable an ordinarily skilled artisan to practice the invention *claimed* in the *non-provisional* application.

*New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1294 (Fed. Cir. 2002) (emphasis in original). The June 9, 2000 non-provisional application cannot, therefore, relate back to the March 2, 2000 provisional application because, as shown above, the earlier application did not provide sufficient written description for the "single action" claim term. The provisional application referred only to "single click," and stressed the importance of one click of a mouse. It is insufficient as a matter of law to refer to a single embodiment as somehow disclosing a much broader, even if overlapping, set of embodiments that were never before disclosed. *See, e.g., In re Curtis*, 354 F.3d 1347 (Fed. Cir. 2004) (earlier-filed application that narrowly focused on a single, specific friction-enhancing coating did not provide adequate written description for later-filed application's claimed broad genus of friction-enhancing coatings); *Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997) ("description of rat insulin cDNA is not a description of broad classes of vertebrate and mammalian cDNA"); *Chester v. Miller*, 906 F.2d 1574, 1576-77 (Fed. Cir. 1990) (earlier-filed narrow disclosure supporting only one species of claims within much broader genus of claims may anticipate but not satisfy the Section 112 written description requirement for later-filed broader claims for other species within genus); *In re MacLean*, 454 F.2d 756 (CCPA 1972) ("[c]ertainly the single exemplary disclosure of using 93% by weight water in the liquid phase provides no support or description of the recited range 'preponderantly water,' *i.e.* anything above 50% by weight"); *McMullin v. Carrol*, 2004 WL 2342562 (Bd. Pat. App & Int. Sept. 2004), *aff'd*, 153 Fed. Appx. 738, at *5-*6 (Fed. Cir. 2005) (narrow description of -5 to +14 range does not support range greater than 15).

### C. TT Did Not Counter eSpeed's Evidence, Instead Arguing About Irrelevant Issues That Do Not Affect The Priority Date

In response, TT's expert Dr. Pirrong did not disagree with the essential facts regarding the written description requirement. At trial, he admitted that he agreed with Mr. Ferraro's observation that there are over 120 recitations of the single click example in the provisional application. (Ex. 36, Pirrong 10/1 PM, at 91-92.) He testified that the provisional application's single click is only an example of the broader single action claim term. (*Id.* at 91.) He admitted that the term "single action" is not defined in the provisional application, and does not even appear there. (Ex. 35, Pirrong 10/2 AM, at 64.) And he admitted that the provisional application emphasized the need for speed along with its disclosure of single click. (*Id.* at 64-67.) No reasonable jury could have concluded, based on the evidence presented at trial, that the June 9, 2000 "single action" claim term was supported by the March 2, 2000 disclosure of a single click.

At trial, TT created three misleading issues, each of which were mere straw man arguments. *First*, Dr. Pirrong gave his opinion about types of actions one of ordinary skill in the art would include as "single actions," but that was irrelevant as a matter of law because the issue is not what the non-provisional application disclosed (which is where the "single action" term was first introduced), but what the provisional application disclosed. *Second*, Dr. Pirrong testified that a single click and a double click were interchangeable, but that was irrelevant as a matter of law because the test is not interchangeability but whether the provisional disclosed anything other than a single click (it did not, and even if it did support a double click, "single action" is not limited to a double click). *Third*, Dr. Pirrong testified that the provisional application did not expressly disclaim actions other than single clicks, but that was irrelevant as a matter of law because express disclaimer is not required, and the context of the provisional application shows the significance of the single click embodiment.

### 1.  Written Description Is Not Claim Construction, And The Provisional Application Did Not Describe Nor Disclose Single Action

*First*, Dr. Pirrong provided his opinion about what different "single actions" were known to one of ordinary skill in the art in the 2000 time frame. (Ex. 36, Pirrong 10/1 PM at 85-92.) That type of testimony, however, would only have been relevant if the provisional application used the term "single action" and the debate had been about what types of actions are included within the scope of that disclosure. But that was not the issue at all. For Dr. Pirrong to raise it and then knock it down, therefore, misdirected the jury's attention into assuming that it was relevant, when it was not, and that the provisional application supported the nonprovisional application, when it did not.

In *Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291 (Fed. Cir. 1999), the Federal Circuit affirmed summary judgment that an earlier application did not have sufficient disclosure to support a later application. In *Augustine*, the earlier application disclosed a blanket that covered a surgery patient's *entire body* to prevent hypothermia. *Id.* at 1294-96. The later application claimed a warming blanket that covered only a *portion* of a patient's body. *Id.* at 1302. The Federal Circuit concluded that the earlier specification's sole disclosure of the entire body did not support claiming only a portion of the body, thereby limiting priority to the later-filed application. *Id.* at 1302-03. Under the correct assessment of the issue in this case (rather than the issue Dr. Pirrong addressed), the provisional application disclosed only single click, single click is different and narrower than single action, and therefore the non-provisional application is the first support for the "single action" claim term.

Furthermore, the "genus/species" argument TT had presented during pretrial briefing was never actually presented at trial. At trial, TT's technical experts never testified about the genus/species theory, did not even say (much less prove) that there was an accepted genus of "single actions," and never assessed how a single click was a "species" or how one of ordinary

skill in the art would have recognized it as such. Even if it had presented the theory, if the broad disclosure of "entire body" from the *Augustine* case did not necessarily include the narrower set of body parts or portion of a body, then a single click cannot, as a matter of law, teach the whole class of "one or more clicks of a mouse button or other input device." The provisional application gave no indication or hint that it disclosed anything other than a single click. Not only are single click and single action different in scope, as the non-provisional application expressly states, but the sole disclosure of a "single click" shows that the inventors possessed only a single click of a mouse, and no other number of clicks and no other order entry devices. *See, e.g., McMullin*, 153 Fed. Appx. at *5-*6 (describing narrow example is not the same as having described a broader concept). The provisional application therefore failed to provide adequate description for "single click," and the asserted patents are entitled only to the June 9, 2000 priority date.

### 2. Even If Single Click Supports Double Click, And It Does Not, Single Click Still Cannot Support Single Action

*Second*, Dr. Pirrong testified that a single click and a double click were interchangeable, and that one of ordinary skill in the art would know how to use a double click based on the disclosure of a single click. (Ex. 36, Pirrong 10/1 PM at 83.) But that was never the issue. Dr. Pirrong's testimony was therefore completely irrelevant. The question had never been whether or not one could use a double click after reading about a single click (of course one *could* do it). The correct question was whether the "single click" described in the provisional application adequately supports the phrase "single action" in the nonprovisional application. It does not.

As a preliminary matter, the provisional taught a single click *to the exclusion of a double click*, and affirmatively taught away from a double click. At trial, Mr. Ferraro pointed out the plain facts that the provisional application disclosed only a single click, stressed the importance

of single click as the "innovation", and consistently taught the essential importance of speed. (Ex. 43, Ferraro 9/25 AM, at 50-52.) Even Dr. Pirrong admitted the importance of speed in the provisional application's disclosure, and how a double click necessarily required twice as much time in the context of order entry where hundredths of a second matter. (Ex. 35, Pirrong 10/2 AM, at 64-68.) The provisional application only disclosed a single click, not a single action. Thus it should not be surprising that changing the scope of the claim terms to something broader in a later application requires accepting that later application date as the priority date. *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998).

It is irrelevant whether or not one reading single click would know how to make and use an embodiment with a double click; that is a question for enablement not for written description. The purpose of the written description requirement is different. As the Federal Circuit explained:

> It is not a question of whether one skilled in the art might be able to construct the patentee's device from the teachings of the disclosure [but] whether the application necessarily discloses that particular device.

*Martin v. Mayer*, 823 F.2d 500, 505 (Fed. Cir. 1987). Thus, although one of ordinary skill in the art might be able to construct a double-click functionality based on a single-click disclosure, but that is not the issue. Given the context of the provisional application, its express teaching of speed, and its exclusive disclosure of a single click, the provisional application did not disclose anything more than a single click. It cannot therefore even support a double click embodiment.

Even if "single click" as used in the provisional supported double clicking, the provisional still does not support the claimed "single action." A "single action," as defined by the Court and the patent specification, is not limited to a single click or a double click (TT had opposed such a construction during claim construction). In fact, a "single action" is not even

40

limited to a mouse, extending instead to any other "input device." Dr. Pirrong went so far as to say that the single action input devices could include a mouse, a keyboard, a game controller, a stylus, or a touch screen. (Ex. 36, Pirrong 10/1 PM, at 92-93.) But the fact that single action could extend to all of these different types of input devices shows exactly the provisional application's deficiency: it disclosed only a mouse and nothing more. Thus, the correct priority date is June 9, 2000, the first time that single action found support in the specification.

### 3. Express Disclaimer Is Not Required To Show Inadequate Written Description

*Third*, Dr. Pirrong testified that the provisional application did not expressly disclaim actions other than single clicks. (*Id.* at 91-92.) The correct question, however, is not whether anything was expressly disclaimed – under that view, rarely if ever would there be a written description issue – but whether the provisional application adequately supported a single action. By framing the argument as requiring an express disclaimer, Dr. Pirrong left a misimpression with the jury, and left unchallenged the fact that the provisional application did not disclose anything other than a single click.

Disclaimer is not required. The question is whether what is claimed by the later-filed application is the *same* as what was disclosed in the earlier-filed application. *New Railhead Mfg.*, 298 F.3d at 1296. The earlier priority date extends only to subject matter that was *actually* disclosed in an earlier-filed application:

> The question is not whether a claimed invention is an obvious variant of that which is disclosed in the specification. Rather, a prior application itself must describe an invention, and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought.

*Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1571-72 (Fed. Cir. 1997). As discussed above, the provisional application did not disclose anything other than a single click. Moreover,

the provisional application expressly stressed the importance of a single click (the sole disclosed embodiment) to achieve the benefit of the claimed invention as compared to the prior art. Had there been any doubt, the provisional application's express distinction of single click order entry over the prior art necessarily limits it to the sole disclosure of a single click. *Tronzo*, 156 F.3d 1154. As a matter of law, an earlier-filed disclosure that touts a "single mouse click" as a key innovative concept fails to provide support for later-filed, generic, broad claims for "single action" as the Court construed the term. *See Cardiac Science, Inc. v. Koninklijke Philips Elecs.*, 466 F. Supp.2d 1150, 1157-58 (D. Minn. 2006); *McMullin*, 153 Fed. Appx. at *5 (limiting application of *Bilstad*); *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479-80 (Fed. Cir.1998) (finding no support where application disclosed sofa controls only on center console location); *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1581 (Fed. Cir. 1997) (uniform disclosure of non-smooth passages cannot support smooth-walled passage).

In summary, the provisional application disclosed only a "single click," so it cannot and does not provide support for the much broader "single action" term, construed to mean "one or more clicks of a mouse or other input device." Therefore, the correct priority date is June 9, 2000, when "single action" was first described.

## III. TT'S PRIOR SALE OF THE INVENTION TO BRUMFIELD INVALIDATES THE ASSERTED PATENTS

A patent applicant cannot sell a product, wait more than one year, and then patent features of that product. Yet that is exactly what plaintiff Trading Technologies did. More than one year before it filed any patent application, TT commercially exploited software embodying the patented invention by selling it to Harris Brumfield and charging more than $150,000. The asserted patents in this case are therefore invalid.

Under the "on sale bar," an invention cannot be sold more than one year before filing for a patent, whether the sale was public or not, whether it was actually used or not, and whether it was later improved or not. In this case, TT sold to Harris Brumfield the "market depth" electronic trading software on September 29, 1998, more than one year before the March 2, 2000 provisional patent application filing date. This was not a case where Mr. Brumfield was an independent inventor merely outsourcing programming details to a third party. To the contrary, TT's own employees Schluetter and Kemp are named inventors on the asserted patents and TT itself is the named assignee that was applying for the asserted patents. Thus, because TT sold the claimed electronic trading software to Harris Brumfield (and even though he is a co-inventor), the asserted patents are invalid by virtue of TT's prior sale.

During the course of the trial in this case, the Court held that there had been no invalidating prior sale in this case, because Mr. Brumfield was not a programmer. The Court did so right after the testimony of TT's witnesses Mr. Geannopoulous and Mr. Brumfield, and before eSpeed had the opportunity to present its evidence on the prior sale issues. Thus, to the extent the Court's ruling relied upon the trial testimony and is construed as a judgment as a matter of law, then eSpeed hereby requests the Court to enter judgment in favor of eSpeed, or grant a new trial, and preserves the record for appeal on the prior sale issue. Defendants incorporate by reference the briefs and oral arguments which have been submitted on this issue, including motions for summary judgment, oppositions to TT's motions for summary judgment, and oppositions to motions *in limine* regarding the prior sale issue (and witnesses' ability to testify about the prior sale). In addition, Defendants state as follows in support of their motion for judgment as a matter of law.

## A. The Facts Proving The Prior Sale Were Not Disputed

TT sold the patented invention more than one year before it filed any patent application. In September 1998, Mr. Brumfield met with Mr. Gary Kemp, who at the time was TT's CEO. (Ex. 45, Brumfield 9/17 AM, at 54-55.) The two discussed and developed a drawing that Mr. Brumfield wanted embodied on a computer screen. The drawing is an attached exhibit with the consulting agreement. (Ex. 46, 9/29/98 Drawing PTX 1276). The drawing depicted the following elements, among others:

- a price ladder and includes commands to "Del All" orders
- market depth including quantities of bids and offers
- "blue" and "red" colored columns
- a "CTR" button to manually re-center the static price ladder, and
- pre-set values for trading parameters.

Mr. Brumfield confirmed at trial that the drawing depicted the later-claimed elements in the asserted patents. (Ex. 45, Brumfield 9/17 AM, at 55-56.) Had eSpeed been allowed the opportunity to present its prior sale evidence as part of its case, it would have included Mr. Kemp's deposition testimony where he acknowledged that the September 1998 drawing was "[a]n early design of that which was patented here in these two patents" and went to so far as to admit that he used the "MD Trader" commercial product description "somewhat synonymously as a layman interchangeably with this design." (Ex. 47, Kemp Dep. Tr., at 98:17-99:4.)

On September 29, 1998, the parties entered into a project agreement to develop software implementing features shown in the drawing, called Individual Consulting Agreement #2. (Ex. 48, 9/29/98 Agreement DTX5.) According to this agreement, TT promised to build a "new trading window according to specifications provided to TT by Harris Brumfield." (*Id.*) Mr. Brumfield agreed to pay $350.00 per hour to have the software programmed according to the agreed specifications. (*Id.*) The agreement expressly required the very same software elements

that TT would later seek to patent: "[t]his new trading window will display market depth and provide the trader the ability to trade directly off the market depth with one click via pre-set options." (*Id.*)

Mr. Brumfield testified at trial that he entered the agreement and that TT agreed to make the product in exchange for hourly fees paid by Mr. Brumfield. (Ex. 45, Brumfield Trans., at 64-68.) Mr. Brumfield further testified that the agreement confirmed that TT, not Mr. Brumfield, owned the intellectual property described in the drawing. (*Id.* at 69-70.) And Mr. Brumfiled confirmed that he was billed for the software by TT. (*Id.* at 71-74.) The September 29, 1998 contract constitutes the sale of the claimed invention by TT to Mr. Brumfield. But TT did not file for a patent until more than one year later, finally filing on March 2, 2000. When it finally filed, the March 2000 drawings hearkened back to the same overall appearance and functionality of the September 1998 drawing:



Bid quantities are in the blue column and ask quantities are in the red column. In this example, the inside market is 18 (best bid quantity) at 89 (best bid price) and 20 (best ask quantity) at 90 (best ask price).

| **Fig. 1: Sept. 1998 Drawing** | **Fig. 2: March 2000 Patent App., at 24** |

TT's March 2, 2000 patent filing came too late. TT had already sold the "market depth trader" software to Mr. Brumfield, invoiced over a quarter of a million dollars for that software, and even completed the project by installing a workstation at Mr. Brumfield's office – all more than a year earlier. TT's patent application later resulted in the '304 and '132 patents now in suit, naming not only Mr. Brumfield, but also TT's Kemp and Schluetter as co-inventors.

**B.    TT's Sale of Market Depth Trader Software More Than One Year Before Filing For A Patent Invalidates the Patents In Suit**

According to the September 1998 contract, TT would charge Mr. Brumfield based upon hours worked, instead of a flat fee, but the result was the same: Mr. Brumfield paid TT money and expected software in return. (Ex. 44, Brumfield 9/17 PM, at 73.) The focus here is

46

not on Brumfield's conduct – he was the *buyer* – but on TT's conduct because TT was the *seller* whose conduct is the focus for the "on sale" bar. TT made money from the patented idea and then, more than one year later, TT and its employees sought patent protection for that idea. This it is not allowed to do under section 102(b) of the Patent Act. *Pfaff v. Wells*, 525 U.S. 55, 67-68 (1998). Because TT's patent application was filed more than a year later after its sale to Mr. Brumfield, TT's March 2, 2000 patent application came too late. The '304 and '132 patents, stemming from that application, are therefore invalid.

1.   **The On Sale Bar Requires Only The Sale of An Invention Ready for Patenting**

The "on sale bar" is mandated by statute, section 102(b) of the Patent Act, rendering invalid any claimed invention that "was…on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). Although previously the test for the on sale bar was more ambiguous, applying the "totality of circumstances" test, now the test involves a bright line rule. *See Brasseler v. Stryker Sales Corp.*, 182 F.3d 888, 889-90 (Fed. Cir. 1999). Since the Supreme Court's *Pfaff* decision, the two part tests requires only that "the invention at issue had become the 'subject of a commercial offer for sale' more than one year before the filing of the patent application; and (2) the invention was ready for patenting, either by, for example, having that invention reduced to practice or by preparing 'drawings or other descriptions of the invention' that would enable one skilled in the art to practice the invention." *Special Devices, Inc. v. OEA, Inc.*, 270 F.3d 1353, 1354-55 (Fed. Cir. 2001) (quoting *Pfaff v. Wells*, 525 U.S. 55, 67-68 (1998)).

This is not a mere technicality; the on sale bar is a statutory condition for patenting under § 102(b) of the Patent Act. The rule promotes the policy of encouraging prompt patent applications so that the patent term is not unduly extended, "confining the duration of the

47

monopoly to the statutory term." *Pfaff*, 525 U.S. at 63. One is therefore not allowed to take commercial advantage of an invention and then patent it more than a year later. Consistent with these policies, even secret sales can trigger the on sale bar. *Special Devices*, 270 F.3d at 1357. The patentee can protect against the on sale bar by timely filing. *See id.* at 1355. All TT had to do was file in a timely manner, but it chose not to do so.

### 2. TT's Sale of Market Depth Trader to Brumfield Invalidates The Patents

Under the first *Pfaff* prong, requiring a commercial offer for sale, "a single offer to sell is sufficient to trigger the 'on sale' bar." *Finnsugar Bioproducts, Inc. v. Amalgamated Sugar Co.*, 2001 WL 303683, at *4 (N.D. Ill. March 28, 2001). On September 29,1 998, more than one year before March 2, 2000, TT offered to sell and sold software and hardware to Mr. Brumfield that embodied the claimed invention, thus satisfying *Pfaff's* two-part test. The September 29 agreement defined exactly what was being sold: "[t]his new trading window will display market depth and provide the trader the ability to trade directly off the market depth with one click via pre-set options." And the contemporaneous September 1998 drawing depicted exactly what TT was selling, a drawing included the elements of the asserted claims.

The sale was complete as of September 29, 1998, even though the programming was not. As a matter of law, even a mere proposal to develop software is sufficient. *Finnsugar*, 2001 WL 303683, at *7. Here, TT and Mr. Brumfield had more than a proposal: they had executed a contract for sale. It is immaterial that Mr. Brumfield did not pay the invoices until after the critical date, or that later versions of the trading software were delivered to Mr. Brumfield after the critical date. *See Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1325, 1333 (Fed. Cir. 1998) ("It is immaterial that the record shows no delivery of the later patented [products] and no exchange of money until after the critical date."). TT agreed to charge

Brumfield for the software on a time and materials basis per the September 29, 1998 contract, and that proves a sale occurred on that date. *See Zacharin v. United States*, 213 F.3d 1366, 1370 ("A contract to supply goods is a sales contract, regardless of the means used to calculate payment and regardless of whether the goods are to be used for testing in a laboratory or for deployment in the field.")

Under the second prong of the *Pfaff* test, TT's patented product was ready for patenting by the September 29, 1998 sale date. To be "ready for patenting" does not require reduction to practice of a finished product, although reduction to practice is one way to show an invention is ready for patenting. *Pfaff*, 525 U.S. at 66-67. Instead, ready for patenting may be proven simply by evidence that "the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* at 67-68. The Federal Circuit found such drawings again sufficient to satisfy the "ready for patenting" test in *Weatherchem*. 163 F.3d at 1333. Just as in *Pfaff* and *Weatherchem*, where detailed drawings showed the patented invention, Mr. Brumfield's September 1998 drawing depicted the trading software TT later sought to patent. As the Supreme Court found in *Pfaff*, the invention was ready for patenting as shown by "[t]he fact that the manufacturer was able to produce the [product] using [the inventor's] detailed drawings and specifications...." *Pfaff*, 525 U.S. at 68. Moreover, as depicted in Figures 1 and 2 in the Statement of Facts above, the similarity between the September 1998 and March 2000 drawings is itself sufficient to find that the market trading software was "ready for patenting" as of September 1998. *See L-3 Comms. Security v. Am. Sci. & Engineering*, No. Civ.A. 04-10339-RWZ, 2005 WL 2323179, at *3 (D. Mass. Sept. 16, 2005); *see also Minton v. NASD*, 226 F. Supp.2d 845, 859-860 (E.D. Tex. 2002). And, in any event, the software was actually reduced to practice by virtue of its delivery

by February 19, 1999. (Ex. 45, Brumfield 9/17 AM, at 69-73.) Because TT sought its patent claims on the very same elements which had already been the subject of sale on September 29, 1998, its patents are invalid.[4]

### 3. That Mr. Brumfield, The Buyer, Is A Named Co-Inventor On The Asserted Patents Does Not Alter TT's Commercial Exploitation

At trial, Mr. Brumfield explained that he did not know how to program, and therefore hired TT for the task. (Ex. 45, Brumfield Trans., at 57-58.) That argument would have had merit if Mr. Brumfield was an independent inventor for the patents-in-suit, because then there would be no person or entity commercially exploiting the invention by offering it for sale and then seeking to file a patent on that invention. Mr. Brumfield would have been the buyer of mere programming services, and there would be no "seller" who wrongfully exploited and then sought to patent the claimed invention.

But that is not what happened here. Mr. Brumfield himself admitted at trial that he was not the only inventor, and that TT's employees Schluetter and Kemp were co-inventors on the asserted patents. (Ex. 45, Brumfield Trnas., at 68.) Mr. Kemp and Mr. Schluetter worked for TT in September 1998, when TT commercially exploited the claimed invention by agreeing to sell the invention to Brumfield, who did not work for TT at the time. Then, TT as assignee of the invention sought to patent the invention more than one year later.

There is no exception to the on sale bar just because TT's sale was made to a co-inventor. Section 102(b) is written in the passive tense, referring to an invention that "was....on sale," and therefore it does not matter who places the invention on sale. *Special Devices*, 270 F.3d at 1355 (affirming summary judgment of invalidity by on sale bar between alleged joint

---

[4] To the extent that TT asserts, with evidence, that certain dependent claims are not fully anticipated because of minor additional claim limitations, then those claim limitations would be inherent or obvious to one of ordinary skill in the art. *Allen Engineering* at 1352; *Weatherchem*.

developers); *see generally Brasseler*, 182 F.3d at 889. A sale is a sale, even if by one inventor to another, and even if the inventors were working together to jointly develop the patented invention. In *Brasseler*, the company DM Manufacturing manufactured surgical saw blades and sold them to Brasseler. *Id.* at 889. More than one year after that sale, individuals from both the seller (DM) and the buyer (Brasseler) filed a patent application. *Id.* Because of the prior sale, the district court held the patent invalid on summary judgment, even though the seller employed two inventors and the buyer employed the remaining four named inventors. *Id.* On appeal, the Federal Circuit affirmed summary judgment, rejecting any "joint development" exception as between buyers and sellers, *id.* at 890, rejecting the argument that the buyer may have initiated development of the invention, *id.* at 891, and rejecting the argument that the sale was kept secret and not publicized. *Id.* at 891. The prior sale invalidated the asserted patent. Here, as in *Brasseler*, the prior sale from TT to Mr. Brumfield invalidates the asserted patents, even though the buyer and seller may have jointly developed the claimed invention, even though the buyer may have initiated development of the invention, and even though the sale may have been kept secret and not publicized. *See id.*

TT sold the patented invention to Mr. Brumfield more than one year before TT filed for a patent application. It is irrelevant that Mr. Brumfield did not know how to program. The facts sufficient to invalidate the patents are that Mr. Brumfield is not the sole inventor, TT's employees are named co-inventors, and TT sold the claimed software to Mr. Brumfield in September 1998. Because of the prior sale by TT to Mr. Brumfield, TT was not allowed to file for a patent more than a year later, and the Court should hold the asserted patents invalid.

## IV.    eSPEED DID NOT INFRINGE AND IS NOT LIABLE FOR INFRINGEMENT

TT alleges that eSpeed directly infringed claims of the '132 and '304 patents, or alternatively, indirectly infringed the claims under theories of contributory infringement or inducing infringement. eSpeed did no such thing. There was no evidence presented at trial to support a conclusion that eSpeed directly or indirectly infringed a single claim of the '132 or '304 patents. With respect to direct infringement, TT failed to present evidence that eSpeed itself – rather than customers or other third parties – practiced each and every elements of the asserted claims. With respect to contributory infringement, TT failed to present any evidence that eSpeed's accused products were incapable of substantial noninfringing use. Finally, with respect to its inducement theory, TT failed to present any evidence that eSpeed had a specific intent to cause others to infringe.

No reasonable jury, on the record presented at trial, could have reached a conclusion that eSpeed directly or indirectly infringed any asserted claims. TT failed to meet its burden of proof, and judgment should be entered in eSpeed's favor as a matter of law.

## A.    TT Has Not Proven Direct Infringement Under 35 U.S.C. § 271(a)

"Infringement requires, as it always has, a showing that a defendant has practiced each and every element of the claimed invention." *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1380 (Fed. Cir. 2007). "This holding derives from the statute itself, which states 'whoever without authority makes, uses, offers to sell, or sells any patented invention within the United States, or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.'" *Id.* (quoting 35 U.S.C. § 271(a)). "Thus, liability for infringement requires a party to *make, use, sell, or offer to sell* the patented invention, meaning the *entire* patented invention." *Id.* (emphasis added).

In this case, TT asserts that eSpeed has directly infringed two kinds of patent claims: method claims, such as claim 1 of the '132 patent ("a method for placing a trade order"); and

client system claims, such as claim 14 of the '132 patent ("a client system for placing a trade order for a commodity"). However, TT has failed to present *any* evidence, much less sufficient evidence, that eSpeed ever practiced the claimed methods to place a trade order. Likewise, TT has failed to present *any* evidence that eSpeed practiced the asserted client system claims, by making, using, or selling a complete "client system" with a "display device" (a monitor) and a "user input device" (*e.g.*, a mouse). *See* '132 patent, claim 14 (Ex. 37, DTX 1). Absent any evidence whatsoever that eSpeed used, made, or sold the elements of an accused claim, TT failed to meet its burden to prove direct infringement.

### 1.    No Evidence Supports Finding Direct Infringement of Method Claims

It is fundamental that "[a] method claim is directly infringed only by one practicing the patented method." *RF Delaware, Inc. v. Pacific Keystone Technologies, Inc.*, 326 F.3d 1255, 1267 (Fed. Cir. 2003). "The law is unequivocal that the sale of equipment to perform a process is not a sale of the process within the meaning of section 271(a)." *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993). Rather, "a method or process claim is directly infringed *only* when the process is performed" – meaning each and every one of its steps. *Id.* (emphasis added); *see also Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1568 (Fed. Cir. 1983) (finding no direct infringement by manufacturer who performed the first step of a process claim even where its customer performed the other step of the claim).

TT has presented no evidence that eSpeed performed the methods claimed in TT's patents. Each asserted method claim requires placing trade orders through a series of steps. (Ex. 37, DTX 1; '132 patent, claims 1, et seq). Claim 1 of the '132 patent – the only asserted independent method claim of that patent – is for "a method of placing a trade order for a commodity on an electronic exchange." That claim expressly requires "selecting a particular

53

area in the order entry region through single action of the user input device with a pointer of the user input device positioned over the particular area to set a plurality of additional parameters for the trade order and *send the trade order to the electronic exchange*."

Likewise, claim 1 of the '304 patent – the only asserted independent method claim in that patent – is for "a method for displaying market information relating to and *facilitating trading* of a commodity." As with claim 1 of the '132 patent, this claim requires "in response to a selection of a particular location of the order entry region by a single action of a user input device, setting a plurality of parameters for a trade order relating to the commodity and *sending the trade order to the electronic exchange*."

During the four-week long trial, TT never introduced one shred of evidence that eSpeed or Ecco ever performed the claimed *method* for entering trade orders with the accused products. Accordingly, as a matter of law, TT cannot have met its burden of proving infringement of these method claims. Because no reasonable jury could have found that eSpeed itself practiced the claimed invention, judgment should be granted as a matter of law that eSpeed did not directly infringe any asserted independent or dependent method claims, which include: Claims 1, 11, 14, 15, and 26 of the '304 patent and Claims 1, 2, 7, 20, 23, 24, 25, 27, 28, and 50 of the '132 patent.

### 2. No Evidence Supports Finding Direct Infringement of Client System Claims

Similarly, TT has not proven that eSpeed makes or sells all of the components of any asserted "client system" claim. The asserted independent "client system" claim in the '132 patent is claim 14; there is no such claim in the '304 patent. Claim 14 of the '132 patent requires a "client system for placing a trade order," and further requires that the system must include "a display device" and a "user input device." (Ex. 37, DTX 1, at claim 14). There was *no evidence* presented at trial that eSpeed ever made, used, or sold a client system with a monitor and mouse.

Nor could there be; eSpeed sells *software*, not client systems or devices. Indeed, TT's expert Christopher Thomas admitted that he has no evidence that eSpeed sold a display device, such as a computer screen. (Ex. 5, 9/19/2007 PM Tr. at 32-33.) Thomas likewise admitted that he has no evidence that eSpeed sells a user input device, such as a mouse. (Ex. 5, 9/19/2007 PM Tr. at 33-34.)

These concessions are dispositive of any direct infringement of the "client system" claims. eSpeed simply does not make, use, or sell "client systems," and lacking the essential elements of these claims, eSpeed cannot be held liable for direct infringement. It is immaterial that eSpeed's customers may assemble a client system combination when they trade;[5] eSpeed cannot be held liable for direct infringement based on the actions of others, as a matter of law. The Federal Circuit recently made very clear that there can be no such thing as direct "joint infringement" by more than one actor. If a particular defendant does not practice each and every element of a claim, then there can be no direct infringement for that claim:

> [E]xpanding the rules governing direct infringement to reach independent conduct of multiple actors would subvert the statutory scheme for indirect infringement. Direct infringement is a strict-liability offense, but it is limited to those who practice each and every element of the claimed invention. By contrast, indirect liability requires evidence of "specific intent" to induce infringement.

*BMC Resources,* 2007 WL 2728400, at *6. Only where a plaintiff provides sufficient evidence that the defendant controlled or directed the actions of an unrelated party carrying out the other steps of the claim, can a plaintiff make a claim for direct infringement under such circumstances. There was no such evidence here. *BMC Resources,* 2007 WL 2728400, at *6-7; *see also Cross Med. Prods. v. Medtronic Sofamor Danek,* 424 F.3d 1293, 1311 (Fed. Cir. 2005) (rejecting argument for combining the acts of surgeons with those of a medical device manufacturer to find

---

[5] Of course, for the customers to infringe, TT would bear the addition burden of showing that each and every element of the claimed client system (and their corresponding functions) were performed by the customer. There was no evidence presented to this effect, as discussed below.

direct infringement of an apparatus claim); *see also Muniaction, Inc. v. Thompson, Corp.*, 2007-14S5, (Fed. Cir. Sept. 28, 2007) (staying injunction based on "joint infringement" in light of recent *BMC Resources* decision).

Thus, because no reasonable jury could find that eSpeed itself practiced the claimed invention, or that eSpeed controlled or directed the actions of any other party in carrying out the other steps of the claimed invention, judgment should be granted as a matter of law of no direct infringement of any "client system" claim, including claims 14, 15, 40, 45, 47, 48, and 52 of the '132 patent.

## B.     TT Has Not Proven eSpeed Is Liable For Indirect Infringement

Moreover, no reasonable jury could have found eSpeed liable for indirect infringement – whether on a theory of induced infringement or contributory infringement. First, TT has failed to meet its threshold burden of presenting evidence of specific acts of infringement by eSpeed's customers. Second, with respect to TT's contributory infringement allegations, TT failed to present evidence that eSpeed's accused products had no substantial non-infringing use. Third, with respect to TT's inducement claims, there was no evidence presented at trial that eSpeed had a specific intent to cause its customers to infringe any of TT's patent claims.

### 1.     TT Presented No Evidence of Direct Infringement by Customers

"Liability for either active inducement of infringement or for contributory infringement is *dependent upon the existence of direct infringement.*"   *Joy Technologies*, 6 F.3d at 774 (collecting cases).   "Thus, either form of 'dependent infringement' cannot occur without an act of direct infringement." *Id.*  "[T]he act of selling equipment which will not be used so as to directly infringe a method claim cannot constitute one of the dependent types of infringement, that is, either contributory infringement or inducement of infringement." *Id.* at 775.

TT failed to meet this threshold burden as a matter of law. Although TT attempted to argue that eSpeed customers used the accused software in an infringing manner, there was no substantial evidence to support that contention. "In order to prove direct infringement, a patentee must either point to *specific instances of direct infringement* or show that the accused device necessarily infringes the patent in suit." *ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007). TT was unable to muster any such evidence.

TT's "star witness" Brian Grey, who was the only witness to testify about the use of the accused Futures View and AutoSpeed Basis, should never have been permitted to testify, for the reasons stated in eSpeed's motion for new trial (incorporated herein by reference). In any event, however, Grey was unable to identify a *single* customer who actually used the Futures View with the automatic recentering feature turned off – an absolutely essential element of TT's proof under this Court's claim construction. (Ex. 49, 9/18/07 AM Trans. at 51 (Grey)). Indeed, Grey admitted he could not even give an *approximate* number on the number of people he allegedly saw using Futures View with the automatic recentering turned off. (*Id.* at 52). TT's other witness on infringement issues, Amanda Lewis, did not know whether any customer ever turned off automatic recentering. (Ex. 56, 9/12/07 AM Trans. at 39-40 (Lewis)).

Nor was Grey ever able to say whether any trader ever used the *entire* claimed method or system. Rather, TT merely elicited testimony from Grey that various companies used *various individual elements of the claims*; not that they actually performed the asserted methods or client systems. (*E.g.*, *id.* at 33-34). And Grey did not even *purport to address* any users of Ecco or Autospeed Basis. For those products there is no evidence of a "specific instance" of direct infringement, and in the absence of any such evidence, the jury's verdict of contributory infringement and inducement cannot stand. *See ACCO*, 501 F.3d at 1313-14 (reversing jury

verdict of indirect infringement where there was no evidence that defendant's product was used in infringing configuration by customers); *See also DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293 (Fed. Cir. 2006) (stating that "mere inferences" that product was used in infringing manner were insufficient.").

### 2.    There is No Evidence Of Contributory Infringement

Beyond this threshold failure to show evidence of direct infringement, TT's allegations of contributory infringement under 35 U.S.C. § 271(c), a matter of law. TT wholly failed to meet its burden of showing that the accused products have no substantial noninfringing use. Moreover, TT had no legal right to make this argument, which they had never raised until the final jury instruction conference.

"In order to succeed on a claim of contributory infringement, in addition to proving an act of direct infringement, plaintiff must show that defendant 'knew that the combination for which its components were especially made was both patented and infringing' and that defendant's components have 'no substantial non-infringing uses.'" *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005); *see also BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1381 (Fed. Cir. 2007) (emphasis added) (stating that this section "requires a mens rea (knowledge) and is limited to sales of components or materials without substantial noninfringing uses."). Accordingly, the submitted final jury instructions required that TT prove, among other things, that eSpeed's software products are incapable of substantial noninfringing use. (Ex. 50, Jury Instr., at § 2.4.2, subsection Contributory Infringement.)

However, TT did not provide *any* evidence that eSpeed's accused products were incapable of substantial noninfringing use. Nor did TT provide any evidence that eSpeed had

knowledge that "the combination for which its components were especially made was both patented and infringing." In the absence of any such evidence, no reasonable jury could have found eSpeed guilty of contributory infringement, and judgment as a matter of law must be granted in favor of eSpeed.

The only evidence at trial clearly demonstrated that eSpeed and Ecco software is *capable* of substantial noninfringing use. Proof of infringing use in this case requires a trade order to be submitted to an electronic exchange through a method that comprises, among other things, "a single action of a user input device" and a "static display of prices." (Ex. 37, DTX 1; '132 Patent at claim 14). The three products at issue – eSpeed's Futures View, Ecco's Price Ladder, and eSpeed's AutoSpeed Basis – are all capable of substantial noninfringing uses because they can be used to enter trade orders (1) without a static price axis, (2) without single action order entry; and/or (3) without either a static price axis or single action order entry.

With respect to the eSpeed Futures View, eSpeed's Chief Product Architect Joe Noviello explained at trial that automatic re-centering was the *default setting* for the Futures View, and there is no evidence that the Futures View was ever delivered to a customer in any other configuration. (Ex. 8, 9/26/07 AM Tr., at 22-24). This Court has held as a matter of law that automatic recentering causes the product to be outside all of the patent claims. (Ex. 51, 6/20/07 SJ Op. at 7-8). Accordingly, the actual default setting of this device is a substantial non-infringing use.

Further, the Futures View is capable of being used to enter trade orders with a multiple-step order entry window ("the order entry detail box"); and it was capable of being used in a "second look" mode, requiring the use of a confirmatory pop-up window. (Ex. 52, PTX 76). TT has conceded that a multiple-action order entry falls outside of its patent claims. (*E.g.*, Ex. 36,

10/1/07 PM Trans. at 102-03, 107-08 (Pirrong); Ex. 1, 10/04/07 PM Trans. at 57). Thus, even if the user *turns off* the automatic recentering feature, the Futures View could be used by customers in a wholly non-infringing manner. These substantial non-infringing uses – and the lack of any evidence to the contrary – preclude a finding of contributory infringement as a matter of law.

Likewise, there is no evidence that the Ecco Price Ladder was incapable of substantial non-infringing use. In fact, an Ecco customer, Mr. Shannon, testified by deposition that traders entered trades with an old-fashioned ticket window, using "a buy pop up, a sell pop up, and tickets in those that you could place orders through tickets," instead of by clicking on the price ladder, because "when you are working on a spread leg you were working orders there in a book . . . *it wasn't that we were rapid firing with single click stuff.*" (Ex. 5, 9/19 PM Tr., at 107-108.) This testimony establishes not only was the Ecco Price Ladder *capable* of substantial non-infringing use, it was actually *used* in a non-infringing way by customers.

With respect to the eSpeed AutoSpeed Basis, TT's own evidence proved that this product was capable of substantial non-infringing use. At trial, TT introduced the manual for AutoSpeed Basis 1.2 as an exhibit. This manual described the order entry of cash market trades by means of an order confirmation dialog box (Ex. 53, PTX11), which is a means of order entry that TT has conceded does not infringe. Moreover, TT's own expert Chris Thomas admitted that trades could be made on other parts of the AutoSpeed Basis screen other than through the static price ladder: "you could actually place an order straight in the middle and the program will do both sides [of the basis trade] for you." (Ex. 54, 9/19 AM Tr., at 45-46.) In fact, placing trades on the "middle" ladder is the primary use for AutoSpeed Basis because the "basis" to be traded "represents the difference" between the left and right sides of the screen (*id.*), rather than actual

prices. Placing orders on the basis is a noninfringing use because it is not an order entry region aligned with any static price axis.

These substantial noninfringing uses mean that eSpeed cannot be held liable for contributory infringement. *See BMC Resources*, 498 F.3d at 1381; *Cross Med. Prods.*, 424 F.3d at 1312-14. Thus, this Court should grant judgment as a matter of law that eSpeed does not contributorily infringe any asserted claims of the '132 or '304 patent.

Furthermore, TT should never have been permitted to present a theory of contributory infringement to the jury. During pretrial, TT submitted a statement of the case which included only the theory of inducement. TT's proposal for the pretrial jury instructions, read to the jury, included only the theory of inducement. Even when submitting final jury instructions and exchanging versions between the parties, TT again included only the theory of inducement. Never, during that entire time, did TT ever rely on a theory of contributory infringement.

TT did not mention contributory infringement until the evening of October 5, 2007, during a final jury instruction conference held *after the close of evidence*. Then, TT raised a theory of contributory infringement. TT's theory thus severely prejudiced eSpeed because eSpeed had no need nor reason to put on additional evidence regarding the substantial non-infringing uses of its products; contributory infringement was not even part of the case while the evidence was still open. Accordingly, for all of these reasons, the Court should grant judgment as a matter of law that eSpeed does not contributorily infringe any asserted claim.

### 3. There Was No Evidence That eSpeed Had Specific Intent to Induce Others to Infringe TT's Patents

TT's primary theory of indirect infringement was its theory that eSpeed actively induced others to infringe TT's patent claims. However, there was no evidence presented at trial that eSpeed ever engaged in such behavior. For the four months at issue in this case, eSpeed and

Ecco provided its customers with products with substantial non-infringing uses, as discussed above. The record is utterly devoid of any evidence that eSpeed or Ecco requested, induced, or otherwise encouraged its customers to use the products to enter trade orders in any infringing manner. In the absence of any evidence of specific intent to infringe, no reasonable jury could have determined that eSpeed actively induced the infringement of any asserted claim of the '132 or '304 patents, and judgment as a matter of law should be granted in eSpeed's favor.

The patent code provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). "The alleged infringer must be shown, however, to have knowingly induced infringement." *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990) (citing *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668, 7 USPQ2d 1097, 1103 (Fed. Cir. 1988). This theory of recovery is akin to a showing of willful infringement; thus, "[i]t must be established that the defendant possessed *specific intent to encourage another's infringement* and not merely that the defendant had knowledge of the acts alleged to constitute inducement." *Id.* The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringements." *Id.* (emphasis in original).

This requirement of specific intent to infringe is clear. The Federal Circuit recently reaffirmed that "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringements." *DSU Med. Corp.,* 471 F.3d at 1304 (quoting *Manville Sales,* 917 F.2d at 554) (emphasis added). Without knowledge of patent infringement, and without specific intent to cause infringement, eSpeed cannot be held liable.

Here, TT presented *no evidence* that eSpeed or Ecco instructed customers to perform acts of infringement with knowledge of the patent. TT attempted to prove inducement solely through the testimony of Brian Grey – a former low-level eSpeed salesperson who was never disclosed as a witness until *long* after the discovery cutoff, and who was not deposed until during the middle of trial. Even assuming that Grey should have been allowed to testify, which he should not have been for reasons detailed in eSpeed's motion for new trial (and incorporated herein by reference), his testimony does not establish that eSpeed or Ecco had specific intent to cause any of its customers to infringe any of TT's patent claims.

Grey actually conceded that the Futures View product had an option to require automatic recentering – which this Court has held is non-infringing as a matter of law. As noted above, eSpeed's chief product architect Joe Noviello testified that this was the default setting. And far from demonstrating a specific intent to cause infringement, Grey testified that he never recommended that any of the customers should use Futures View with automatic recentering turned off. (Ex. 49, 9/18/07 AM Trans. at 47-48). And he did not know whether anybody else at eSpeed recommended that automatic recentering be turned off. (*Id.*). Likewise, Grey testified that he never reported to anyone at eSpeed that users were using the product with automatic recentering turned off. (*Id.* at 54-55). There is no record evidence that anyone at eSpeed (apart from Grey, allegedly) was aware that any customer turned of automatically recentering, must less that any customer entered single action trades in that configuration. TT wholly failed to show that eSpeed was even *aware* that (some alleged, unidentified) traders were supposedly using the product in this configuration, much less that they specifically encouraged such use. And Grey failed to address the AutoSpeed or Ecco products. *See e.g., MercExchange, LLC v. eBay, Inc.*, 401 F.3d 1323, 1332 (Fed. Cir. 2005), *vacated on other grounds*, 126 S.Ct. 1837

(2006) (rejecting inducement theory where plaintiff presented no evidence that defendant even knew about alleged infringing use by its customers).

Through Grey's testimony, TT attempted to show inducement by the discussion in a Future View user manual, concerning disabling the automatic recentering feature. (Ex. 49, 09/18/07 AM Tr. at 20; Ex. 48, PTX 76). But that is not evidence of a specific intent to cause users to infringe. Displaying a static price axis is only *one element* of TT's patent claims. *See id.* ("Posting goods for sale, however, is relevant to only one limitation of the claims . . . There is no testimony or other record evidence that [defendant] intended to induce [its customers] to incorporate the *other* limitations of the asserted claims."). The same user manual also describes many ways to use the software with order entry methods that do not infringe. (Ex. 52, PTX 76) For instance, even if a user turned off automatic re-centering per the user manual, such that the price ladder was static, the user could still enter trade orders in a perfectly legitimate, non-infringing way by following the same user manual's instructions to pull up pop-up windows and enter orders by typing in all of the parameters. (*Id.*).

The user manual is not substantial evidence of infringement as a matter of law. The Federal Circuit has held that a user manual cannot provide evidence of inducement of a method claim where it does not describes the entire method, but only the steps of a method in *isolation. See, e.g., E-Pass Technologies, Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) ("[T]he evidence here shows, at best, that the Palm defendants taught their customers each step of the claimed method in isolation. Nowhere do the manual excerpts teach *all of the steps of the claimed method together*, much less in the required order.") (emphasis added). This case is no different.

Moreover, as detailed in eSpeed's JMOL motion on willfulness (which is incorporated herein by reference), there is uncontradicted evidence of eSpeed's good faith with respect to TT's patents. Once TT's patents actually issued, and eSpeed learned about them, eSpeed changed its products – which had substantial non-infringing uses to begin with – so as to prevent any customer from *ever* using them to infringe. The changes were implemented in an expedited manner, and eSpeed's Chief Architect Joe Noviello testified that they were made as fast as possible. (Ex. 8, 9/26 AM Tr., at 30-31.) TT's expert Mr. Nixon acknowledged that eSpeed's redesigns were done in a relatively short time frame and the fact would "negate willfulness." (Ex. 55, 9/20 PM Tr., at 133-134.)

The Federal Circuit was presented with a similar situation in *Manville Sales*, where it reversed the district court's finding of inducement. There, the district court held the defendants were liable for inducing infringement, even though they were not aware of the asserted patent until suit was filed, and the subsequent infringing acts continued upon "good faith belief" that the product did not infringe. 917 F.2d at 553. The Federal Circuit held that the judgment of "inducement" was "contrary to law," because there was "neither compelling evidence nor any findings that the [defendants] had specific intent to cause another to infringe." *Id.* at 554. That is the case here.

TT simply presented no evidence that eSpeed or Ecco intended to cause patent infringement by its customers. The other accused software was delivered to customers for use before the patents issued. When eSpeed and Ecco learned of the existence of the patents they redesigned the products to foreclose the possibility of any customer using the product in an infringing manner. Without proof of these essential elements of inducing infringement, no

reasonable jury could conclude that eSpeed should be held liable for induced infringement. Accordingly, the Court should grant judgment as a matter of law in eSpeed's favor.

## CONCLUSION

For all of the foregoing reasons, the Court should grant eSpeed judgment as a matter of law that (1) all of the asserted patent claims are invalid as obvious and/or anticipated; (2) the correct priority date is June 9, 2000 when "single action" was first adequately described; (3) the asserted patent claims are invalid because of the prior sale by TT to Mr. Brumfield; and (4) eSpeed is not liable for infringement.

Dated: November 20, 2007

Respectfully submitted,

**eSPEED, INC., eSPEED INTERNATIONAL LTD., ECCO LLC, and ECCOWARE LTD.**

By: _____ s/   Andrew Johnstone ____

One of its Attorneys

George C. Lombardi
Raymond C. Perkins
Andrew M. Johnstone
Winston & Strawn
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

Gary A. Rosen
Patrick Madamba, Jr.
Law Offices of Gary A. Rosen, P.C.
1831 Chestnut Street, Suite 802
Philadelphia, PA 19103
(215) 972-0600

Attorneys for Defendants eSpeed, Inc., eSpeed International, Ltd., Ecco LLC, and EccoWare, Ltd.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he caused a copy of the foregoing ESPEED'S COMBINED BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW THAT THE ASSERTED CLAIMS ARE INVALID BASED ON ANTICIPATION, OBVIOUSNESS, PRIOR SALE, HAVE A JUNE 9, 2000 PRIORITY DATE, AND ARE NOT INFRINGED to be served this 20th day of November, 2007 via Federal Express and/or E-Mail as follows:

Matthew J. Sampson
MCDONNELL BOEHNEN
  HULBERT & BERGHOFF LLP
300 South Wacker Drive
Chicago, Illinois 60606

sampson@mbhb.com

*Counsel for Trading Technologies*
*International, Inc.*

Geoffrey A. Baker
DOWELL BAKER, P.C.
229 Randolph Street
Oak Park, Illinois 60302

gabaker@dowellbaker.com

*Counsel for Rosenthal*
*Collins Group, LLC*

Nina F. Wang
FAEGRE & BENSON, LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO 80203

nwang@faegre.com

*Counsel for CQG, Inc. and*
*CQGT, LLC*


Steven F. Borsand
TRADING TECHNOLOGIES
  INTERNATIONAL, INC.
222 South Riverside, Suite 1100
Chicago, Illinois 60606

steve.borsand@tradingtechnologies.com

*Counsel for Trading Technologies*
*International, Inc.*

Stephen Lesavich
LESAVICH HIGH-TECH LAW
  GROUP, P.C.
39 South LaSalle Street,
Suite 325
Chicago, IL 60603

lesavich@lesavich.net

*Counsel for Rosenthal*
*Collins Group, LLC*

Kara Cenar
BELL, BOYD & LLOYD LLC
70 West Madison Street
Suite 3100
Chicago, IL 60602

kcenar@bellboyd.com

*Counsel for CQG, Inc. and*
*CQGT, LLC*


Lora A. Moffatt
Alison G. Naidech
SALANS
Rockfeller Center
620 Fifth Avenue
New York, NY 10020

lmoffatt@salans.com
anaidech@salans.com

*Counsel for GL Trade SA,*
*GL Consultants, Inc., and*
*FuturePath Trading LLC*

Jeffrey Schulman
WOLIN & ROSEN, LTD.
55 West Monroe Street
Suite 3600
Chicago, IL 60603

jschulman@wolinlaw.com

*Counsel for Rosenthal*
*Collins Group, LLC*

James R. Branit
Brian Norkett
BULLARO & CARTON, P.C.
200 North LaSalle
Suite 2500
Chicago, IL 60601

b_norkett@hotmail.com

*Counsel for GL Trade SA,*
*GL Consultants, Inc., and*
*FuturePath Trading LLC*


_____ s/   Andrew Johnstone _____